UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

NO. 5:99CV144-1-V

| | | |
|---|---|---|
| ROBERT CHARLES BRAGG, | ) | |
| Petitioner | ) | |
| | ) | |
| v. | ) | **MEMORANDUM IN SUPPORT OF** |
| | ) | **PETITION FOR WRIT** |
| | ) | **OF HABEAS CORPUS** |
| LOOMIS WOODARD, Superintendent, | ) | |
| Respondent. | ) | |
| | ) | |

This action is before the court on a Petition for Writ of Habeas Corpus by Robert Charles Bragg, a prisoner of the State of North Carolina, pursuant to 28 U.S.C. §2254. The facts alleged herein appear in the record of the case. If the Court wishes to view any portion thereof prior to determining whether to require a response from Respondent, undersigned counsel will promptly make it available upon request.

## PROCEDURAL HISTORY

On February 26, 1996, a jury in Watauga County, North Carolina convicted Petitioner of first degree murder. Petitioner was sentenced to life in prison without parole. On February 17, 1998, the North Carolina Court of Appeals affirmed the conviction in an unpublished decision. *State v. Bragg*, No. COA97-95 (17 February 1998) (attached). Petitioner appealed to the Supreme Court of North Carolina, which denied his petition on June 24, 1999. *State v. Bragg*, No. 66P99 (24 June 1999).

## STATEMENT OF FACTS

Marvin "Coy" Hartley was found dead in his mobile home, located in a trailer park in the

1

town of Boone, having died between 5:00 p.m. and 6:30 p.m. on Thursday, December 8, 1994, (Trial Transcript, Vol. III, T p. 461, line 16[1]) from a blunt trauma to his head. Vol. III, T p. 475, lines 19-20. Hartley's wallet was missing (Vol. IV, T p. 694, lines 17-18). He had a reputation for keeping large amounts of cash money, but no money was found about the premises. Vol. IV, T p. 702, lines 7-12; Vol. VII, T pp. 1228 line 5 - 1229, line 19. Blood was splattered on the curtains (Vol. III, T pp. 515, lines 7-8 and 531, lines 24-25) and on the ceiling of the mobile home. Vol. IV, T p. 696, lines 1-2. A hammer was found lying on a counter in the room where the corpse was found. Vol. IV, T pp. 759-761. The hammer was never taken into custody by the police (Vol. IV, T p. 761), the blood found at the scene was not tested (Vol. IV, T p. 721 lines 18-24), and the crime scene was never analyzed for fingerprints or trace evidence. Vol. IV, T p. 702 lines 15-20; Vol. IV, T p. 730 lines 10-25; Vol. IV, T p. 746 lines 9-15.

Law enforcement began investigating the homicide shortly before 7:30 p.m. on December 8, 1994. Vol. II, T p. 356. On the morning of Friday, December 9, the Boone Police Department and the State Bureau of Investigation (SBI) questioned Kenneth Eugene Coffey. Vol. IV, T p. 704, line 2. Vol. II, T p. 371, lines 16-21. Coffey admitted to having detailed knowledge of Hartley's death (Vol. IV, T pp. 704, line 24 - 705, line 1), but denied any personal involvement. Instead, he claimed that Robert Charles Bragg had beaten the decedent to death using a trailer hitch ball inside of a sock. Vol. IV, T pp. 704-5.

Coffey's implicating statements resulted in Petitioner's arrest in Mountain City, Tennessee on December 10, 1994. When arrested, Petitioner gave the SBI a complete signed

---

[1]The Transcript of Petitioner's trial consists of volumes I-VII of Jury Selection Transcript and volumes I-IX of Transcript. All references herein to the transcript are to the I-IX volumes of the trial, exclusive of the Jury Selection Transcript.

2

statement providing detailed information concerning his whereabouts from the time he left Boone, North Carolina on December 7, 1994 (a day prior to Harley's murder), up until the time of his arrest. His statement also included the names of numerous witnesses to his alibi. Record on Appeal, hereinafter R., pp 34 - 39.

Police investigators seized all of Petitioner's clothing when they arrested him in Tennessee. Vol. VII, T pp. 1119-1120. Police found no money in Petitioner's wallet, and all of his belongings were either in the pockets of his clothing or found inside his guitar case, which he used as a "suitcase". Vol. VI, T p. 1050. A trailer hitch ball, but no sock, was found inside of his coat pocket. Vol. VII, T pp. 1119-1120. Laboratory testing of Petitioner's clothing failed to reveal the presence of any blood or bloodstains. Vol. IV, T p. 778, lines 7-8. The police opted not to have the trailer hitch ball analyzed by the SBI lab. Vol. IV, T p. 781, lines 18-20.

At trial, the State's case was built around the testimony of Kenneth Coffey, who testified under a grant of use immunity (R. p. 59) because he was appealing his own conviction for murdering Hartley. Since no direct physical evidence tied Petitioner to the murder, Coffey's credibility was a pivotal issue at trial. Coffey had been interviewed several times by law enforcement prior to his ultimate arrest on January 6, 1995, and had given a different version of the story each time. Although Coffey told the police that Petitioner was responsible for killing Hartley, he confessed on other occasions to sole responsibility for the crime and told cell mates that Petitioner was not involved. Vol. V, T pp. 970, line 25 - 971 line 5; 972, lines 9-15; 975, lines 1-5; 977, lines 10-13; 980 lines 20-23.

In anticipation of receiving a new trial from the Supreme Court, Coffey had renewed negotiations with the State through which he hoped that the District Attorney might agree to accept a negotiated plea entitling Coffey to a 15- year sentence, rather than life in prison without

3

parole, in exchange for testifying against Petitioner. Vol. II, T pp. 250-4. Additionally, the District Attorney's office had discussed with Coffey's lawyer the possibility of interceding with the Governor on Coffey's behalf to obtain a reduction in his sentence. Vol. II, T p. 253, lines 3-16.

Coffey's mental state both at the time of Hartley's murder and during the trial of Petitioner was questionable. During the course of his own trial, Coffey received a psychological evaluation which revealed that he is borderline mentally retarded, and prone to answering inquiries in a way that will place him (Coffey) in a favorable light. Vol. II, T p. 218. In a voir dire competency hearing, a psychologist who previously examined Coffey also stated, "a person functioning at the level of intelligence which he (Coffey) did tends to respond in a way that a person wants them to. Vol II, T p. 215. To further explore Coffey's mental health, Petitioner attempted to obtain Coffey's medical and mental health records by subpoenas *duces tecum* to attorneys Diane Griffin and Robert West, each of whom had previously represented Coffey. Dianne Griffin represented Coffey in a social security disability proceeding and Robert West represented Coffey during his trial for first-degree murder, which was then under appeal. To access these records, Petitioner filed a written motion asking the trial court to "waive" Coffey's privilege concerning the records and requesting that the trial court review the records *in camera*. Upon determinating that the records maintained by the attorneys had not been placed into evidence during Coffey's trial, the trial court ordered that the documents be kept from Petitioner, based upon Coffey's assertion of privilege. Vol. II, T p. 186.

On the witness stand, Coffey testified to many details concerning his mental and medical conditions and the trial court expressly found that he had waived his psychiatrist-patient privilege. The court then allowed the line of questioning to proceed, noting further that the

4

interests of justice required that Coffey answer Petitioner's cross-examination questions about his mental health. Vol. II, T pp. 328-330. Coffey admitted that he had been drinking for several days at the time of Hartley's death, experienced alcoholic blackouts (Vol II, T p. 246), and had not been taking his prescribed antidepressant medications (Vol. II, T pp. 320-321, 323). He also testified that he had suffered traumatic head injuries which caused him to have two metal plates in his skull and resulted in memory loss and brain damage. Vol. II, T p. 205 lines 2-5; Vol. II, T p. 246, lines 11-13.

To bolster Coffey's story, the State relied on the testimony of Linda Renee Nelson and her nine year old son, Jeffrey, placing Petitioner near the scene of the crime at the time of Hartley's death. Jeffrey claimed to have seen Petitioner and Coffey walking behind Coy Hartley on the road to the victim's trailer shortly before the murder. Vol. III, T pp. 632-636. Linda Renee Nelson claimed that she had seen Petitioner and Coffey taunting and the victim and following him on the road to his mobile home shortly before the murder (Vol. III, T p. 578 lines 2, 12-20) and that Petitioner was carrying a heavy round object inside of a black sock as he walked. Vol. III, T p. 580 lines 2-5; Vol. III, T p. 593 lines 2-25.

The Nelsons testimony was suspect since it contradicted other evidence presented by the State. Coffey's own testimony indicated that the victim had been inside his mobile home waiting for Coffey to deliver a bottle of vodka. Vol. II, T pp. 225-228. Coffey also testified that the sock Petitioner had in his pocket was white, not black. Vol. III, T pp. 535, 549.

Petitioner presented strong alibi evidence showing that he was not in Boone, North Carolina on December 8, 1999, the night that Coy Hartley was murdered. Petitioner's whereabouts throughout the time of the Hartley murder were well documented in the testimony of several alibi witnesses. Two witnesses, Edwards and Laney, testified that Edwards met

5

Petitioner on Wednesday, December 7, 1994 at around 3:40 p.m. and drove him to Mountain City, Tennessee, arriving around 5:00 p.m. Vol. V, T pp. 905-908; Vol. V, T pp. 894-897. From that point on, Petitioner's whereabouts in Mountain City were accounted for by town residents who saw him over the course of the next three days.

Jim Bragg, Petitioner's brother, testified that Petitioner arrived at his home around 9:00 p.m. on December 7, and spent the night in his basement. Vol. VI, T p. 1045. Jay Manuel testified that he met up with Petitioner sometime shortly after 10:45 a.m. on Thursday, December 8 and spent the entire afternoon and evening with him, with the exception of a brief period when Petitioner left to make a phone call. Vol. VII, T p. 1206-1208. Judy Thomas testified that she first saw Petitioner at Jay Manuel's trailer on the morning of December 8 and that she later walked with him to use a public telephone between 5:00 and 6:00 p.m. Vol. VII, T p. 1160. Ms. Thomas also testified that she heard Petitioner make a collect call to his sister and ask for money. Vol. VII, T p. 1163. Ms. Thomas claimed she then walked with Petitioner back to Jay Manuel's trailer, where she cooked supper for Manuel and Petitioner, and where she and Petitioner spent the night together. Vol. VII, T p. 1163-1164.

Additional defense evidence corroborated the testimony of Jay Manuel and Judy Thomas. Phyllis Smith produced telephone bills confirming that Petitioner made a four-minute collect call to her at 6:54 p.m. on Thursday, December 8, 1994 from a public pay phone located in Mountain City, Tennessee. Vol. VII, T pp. 1255-1256. Jackie Shoemake and her husband John Shoemake both testified that they saw Petitioner, Judy Thomas, and Jay Manuel at Manuel's trailer shortly after noon on Thursday, December 8, and that they were in Petitioner's presence throughout the day, until sometime after dark. Vol VII, T pp. 1175-1184.

In addition to his alibi defense, Petitioner attempted to offer evidence showing that

6

Coffey had committed the murder with the assistance of another person, Greg Richardson. As part of this strategy, Petitioner hoped to introduce a confession made by Coffey and overheard by Shawn Delp. Delp, who had been in jail with Coffey, overheard a telephone conversation in which Coffey stated that Gregg had been present and that Petitioner was not involved in the crime. The trial court sustained the State's hearsay objection and refused to allow Petitioner to impeach Coffey with Delp's account of his prior inconsistent statement. Vol. VIII, T pp. 1235, 1239-40.

To counter the Nelsons' testimony, Petitioner offered character evidence showing that Linda and Jeffrey had a poor reputation for truthfulness in the community, and there was testimony that Jeffrey Nelson had previously stated that he and his mother were being paid by Crimestoppers to implicate Petitioner. Vol. VII, T p. 1233, App. p. 24. When first interviewed by the SBI, Linda Renee Nelson denied any knowledge concerning Hartley's death, except to state that she had seen Coffey, alone, in the vicinity of Hartley's trailer. Vol. III, T p. 582.

After giving notice of appeal, Petitioner again formally sought access to Coffey's psychiatric and medical records, in order to prepare his appeal. In a written motion, Petitioner asked the trial court to conduct an *in camera* review. R.pp. 114-116. The trial court again rejected this request and instead ordered that the records remain sealed and available only for appellate review. R.pp. 117-119.

In its order denying Petitioner's appeal, the North Carolina Court of Appeals, after reviewing the sealed mental health records which related to Coffey's competency to stand trial, "fail[ed] to see how the information could have benefitted the defendant as he examined Coffey about his head injury, memory loss, treatment at Broughton Hospital, and New River Mental Health Clinic, as well as about any medications he was taking ." Slip opinion, pp. 10-11. The

7

court then held that no prejudice resulted to Petitioner and dismissed the claim.

## REASONS FOR GRANTING THE WRIT

### I. THE STANDARD OF REVIEW

Pursuant to 28 U.S.C. §§2254(d)(1) and (2) (1996), this Court may not grant its writ with respect to any claim that was adjudicated on the merits in state court unless that adjudication either; 1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or 2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Petitioner respectfully submits that the decision of the North Carolina courts in ruling that he was not entitled to an *in camera* review and disclosure of Kenneth Coffey's medical and mental health records was an unreasonable interpretation of clearly established federal law as determined by the Supreme Court in *Pennsylvania v. Ritchie,* 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987), *supra.*

### II. THE APPLICABLE CLEARLY ESTABLISHED LAW

#### ISSUE 1: NO *IN CAMERA* REVIEW OF COFFEY'S MENTAL HEALTH RECORDS

The trial court's refusal in this case to conduct an *in camera* review of Kenneth Coffey's medical and mental health records violated well-established constitutional principals and improperly denied the defendant access to material, exculpatory evidence. Under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, it is well settled that the prosecution, as well as any state agency subject to judicial control, must disclose evidence favorable to an accused upon request, when such evidence is material to guilt or punishment. *Love v. Johnson*, 57 F.3d 1305 (4th Cir. 1995)(state court's refusal to inspect the identified records *in camera* and to seal them for appellate review violated defendant's

8

constitutional rights). Further, the government's obligation to disclose favorable evidence under *Brady* extends beyond merely revealing exculpatory evidence and includes disclosing information that serves to impeach the credibility of government witnesses or co-defendants. *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct.763, 765, 31 L.Ed.2d 104 (1972); *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375 (1985) (plurality opinion) (impeachment evidence as well as exculpatory evidence is subject to *Brady* disclosure requirements.)

    *Pennsylvania v. Ritchie,* 480 U.S. 39, 57, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987), reaffirmed the constitutional right of an accused to compel disclosure of evidence in the government's possession that "is both favorable to the accused and material to guilt or punishment." In *Ritchie*, the court held that a defendant accused of sexually abusing a child had the right under the Due Process Clause of the Fourteenth Amendment to have confidential records of a child abuse agency turned over to the trial court for *in camera* review and release of material information. Before his trial, defendant Ritchie served a Pennsylvania social service agency (CYS) with a subpoena seeking access to records concerning the alleged victim. CYS acknowledged that such records existed, but claimed that the records were privileged under Pennsylvania law and refused to produce them. Ritchie argued that the records might contain the names of persons who could possibly be favorable witnesses at trial. He also specifically requested a medical report, which he believed CYS compiled during its investigation. The trial court refused to order CYS to disclose the files. At trial, the victim was the key witness against Ritchie. Despite a thorough cross-examination, attempting to rebut her testimony and attack her reasons for not reporting the incidents sooner, Ritchie was convicted. *Id*. The Supreme Court held that denying Ritchie access to the CYS documents violated his right under the due process clause of the Fourteenth Amendment to review such relevant information.

9

The *Ritchie* decision implemented the right announced in *Brady v. Maryland* to disclosure of exculpatory evidence. In establishing this right to disclosure, the Supreme Court defined evidence as "material" where "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different" *Id.* (citing *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383-84 (opinion of Blackmun, J.)). The Court further defined a "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.* Moreover, the Supreme Court's definition of "favorable" evidence is not limited to evidence tending to negate guilt, but also includes evidence tending to impeach the credibility of a key witness for the prosecution. *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).

Under *Ritchie*, the court must conduct a two-step analysis. In the first step, the court evaluates whether an *in camera* review is necessary. The accused need not be certain that particular exculpatory information exists. Nor is the accused required to specify the exact information and how it is material and favorable. Instead, the *Ritchie* decision establishes the "plausible materiality" test, which applies where a criminal defendant seeks discovery of privileged communications. No more than a "plausible showing" is required to trigger the right to an *in camera* judicial inspection because of the practical impossibility in the susual case that an accused can show more. *Ritchie*, 480 U.S. at 58 n.15, 107 S.Ct. 989. Under the *Ritchie* test, if the trial court's *in camera* review reveals sufficiently material and favorable evidence, then the defendant is constitutionally entitled to *in camera* access to the information. *Id.* at 58, 107 S.Ct. 989 (requiring new trial if post-conviction *in camera* review reveals constitutional right to use of withheld materials).

As a second step, *Ritchie* calls for a balancing inquiry. If the *in camera* review indicates

10

that the accused is entitled to disclosure of all or portions of the inspected materials, then the court must weigh any claims of privilege against the accused's need to use the materials as evidence at trial. *Ritchie*, 480 U.S. at 57 & n. 14, 107 S.Ct. 989. In its balancing inquiry, the court may uphold confidentiality and protect the materials from public disclosure pending a decision through the use of appropriate protective orders. *United States v. Nixon*, 418 U.S. 683, 714-16, & n. 21, 94 S.Ct. 3090 (1973).

The trial court clearly violated the mandate of *Ritchie* by denying Petitioner an *in camera* review of Kenneth Coffey's medical and mental health records. Like the defendant in *Ritchie*, Petitioner issued a subpoena *duces tecum* to obtain confidential records deemed necessary to a full and fair defense. Petitioner also filed motions requesting review and disclosure of Coffey's mental health records and alleged that the subpoenaed attorneys possessed files containing a professional psychological evaluation of Coffey performed by Dr. Knight during Coffey's own murder trial. Petitioner further alleged, upon information and belief, that these records contained important additional information bearing on Coffey's capacity to testify, as well as his truthfulness and the reliability of his statements. By specifically identifying the location of Mr. Coffey's medical and psychiatric records, as well as the type of information that might be gleaned from these records, Petitioner clearly satisfied the "plausible showing" standard established under *Ritchie*.

Moreover, it is clear that any balancing test performed by the trial court would have likely resulted in disclosure of the information to Petitioner. In *United States v. Society of Independent Gasoline Marketers of America*, 624 F.2d 461 (4th Cir. 1979), the Fourth Circuit emphasized the weight that should be accorded to the defendant, saying,

Although a trial court should seek to prevent the disclosure of embarrassing,

11

> irrelevant information concerning a witness, it is an abuse of discretion to
> preclude defense counsel from obtaining relevant information, and the witness'
> privacy must yield to the paramount right of the defense to cross-examine
> effectively the witness in a criminal case.

*Id.* at 469 (citing *Davis v. Alaska*, 415 U.S. 308, 319, 94 S.Ct. 1105,39 L.Ed.2d 347 (1974).

Through the arguments presented to the judge and the jury in his own trial, Coffey indisputably

waived any privilege regarding his mental health. In this earlier trial, Coffey's attorney argued

Coffey's mental illness, brain damage, and low I.Q. invalidated the "consents" and "confessions"

he had given to police investigators, thereby diminishing his culpability for the offense, and

justifying a lenient sentence. Thus, the potential harm to Coffey's privacy from disclosure of his

medical and mental health records would have been negligible compared to the prejudice visited

upon Petitioner's constitutional rights of due process and confrontation.

## III.    Prejudice

In habeas corpus cases, the federal court must review the record and decide "whether the

error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*

*v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), *quoting Kotteakos*

*v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Demonstrably, the

Due Process violation here was highly influential in the guilty verdict.

The State's evidence against Petitioner was weak, at best. No physical evidence

connected Petitioner with the crime. The State's key witness was Kenneth Coffey, the very

person initially suspected of committing the crime. Coffey had negotiated an agreement with the

State through which he hoped to receive a sentence of 15 years, instead of a possible capital

sentence, in return for testifying against Petitioner. Coffey also had a long history of serious

mental health problems. Coffey's story repeatedly changed throughout the course of the

12

investigation and there were numerous and substantial inconsistencies in his versions of the events.

Only two other witnesses presented testimony linking Petitioner to the murder. The testimony of both was highly suspect. Linda Renee Nelson and her nine year old son, Jeffrey, both testified to seeing Coffey and Petitioner in the vicinity of the victim's home near the time of the murder. However, when interviewed by investigators on the day of the murder, both Linda and Jeffrey claimed to have no knowledge of the crime. It was only after seeing Petitioner's picture in the local newspaper and reading an article about the investigation and reward, that the Nelsons contacted police and claimed to have seen the two suspects in the neighborhood prior to the murder. Further, the Nelsons' testimony is contradictory and does not agree with other evidence offered by the State. Lastly, the Nelsons received a substantial reward from the local Crimestoppers organization in return for their story.

In contrast to the State's weak evidence, Petitioner presented strong alibi evidence at his trial. Petitioner's whereabouts throughout the time of the Hartley murder were well documented in the testimony of several alibi witnesses. Two witnesses, Edwards and Laney, testified that Edwards met Petitioner on Wednesday, December 7, 1994, at around 3:40 p.m. and drove him to Mountain City, Tennessee, arriving around 5:00 p.m. From that point on, Petitioner's whereabouts in Mountain City were accounted for by town residents who saw him over the course of the next three days. (These witnesses included Jay Manuel, Jim Petitioner, Judy Thomas, Jackie Shoemake, John Shoemake and Belinda Reese.) Their testimony places Petitioner continuously in Mountain City up until the time of his arrest on Saturday, December 10, 1994.

With little evidence contradicting Petitioner's substantial alibi defense, Coffey's

13

testimony and credibility as the key prosecution witness were crucial to the State's case. Any information undermining Coffey's credibility would have changed the outcome of the jury's deliberations. Petitioner's defense was dealt a fatal blow when he was completely denied the opportunity for the *in camera* review regarding the believability of Coffey's testimony against him. Thus, Petitioner's trial was prejudiced by the trial court's failure to conduct an *in camera* review of Coffey's mental health and medical records.

In at least two cases, the Fourth Circuit Court of Appeals has held that the trial court's failure to review and disclose information impacting on the credibility of a key government witness constitutes prejudicial error. In *Chavis v. North Carolina*, 637 F.2d 213 (4th Cir.1980), the Fourth Circuit Court of Appeals reversed and remanded the conviction of Benjamin Chavis and nine co-petitioners. The *Chavis* court determined that suppression of psychiatric records of two of the prosecution's crucial witnesses denied defendants' due process rights in light of their specific request for "psychiatric or other reports which might tend to reflect on the credibility or competency of ... prospective witnesses." *Id.* at 224-25. The undisclosed psychiatric reports at issue in *Chavis* revealed that the witness had "an IQ of 82 placing him in the range of borderline defective" and, the court reasoned, "may have [had] some bearing on the witness' ability to recall in minute detail events that occurred at least one and one-half years prior to the time he was testifying." *Id.* at 219-220.

As in *Chavis*, Kenneth Coffey was the most important prosecuting witness; his testimony constituted the very foundation of the State's case against Petitioner. There was very little corroboration of Coffey's testimony; in fact, the great majority of witnesses in the case gave testimony contradicting Coffey. Like the witness in *Chavis*, Coffey functioned at a borderline intellectual level. Testimony in Coffey's own trial revealed that he had a low IQ of only 75,

14

which was described as "educable mentally handicapped." *State v. Coffey*, 480 S.E.2d 664, 345 N.C. 389 (1997). The extra impeachment materials that might have been gleaned from Coffey's mental health and medical records could have provided the weapons for Petitioner to attack Coffey's credibility, which, of necessity, lay at the heart of the State's case against Petitioner.

An earlier ruling of the Fourth Circuit Court of Appeals further emphasizes that the prejudice to Petitioner's defense was not cured by the *in camera* review of Coffey's records performed by the North Carolina Court of Appeals. In *United States v. Society of Independent Gasoline Marketers of America*, 624 F.2d 461 (4th Cir. 1980), *cert. denied sub nom. Amerada Hess Corp. v. United States*, 449 U.S. 1078, 101 S.Ct. 859, 66 L.Ed.2d 801 (1981), the Fourth Circuit Court of Appeals reversed a conviction because the defendants had been denied access to psychiatric records revealing that the principal government witness was "delusional and hallucinatory with poor judgment and insight" and had been "secluded for his own welfare." *Id.* at 469. After an *in camera* inspection, the trial court informed defendant's counsel that the records reflected two periods of hospitalization (one during the charged conspiracy and one prior to it) involving a "mental disorder or illness at the time." *Id.* at 467. Although the trial judge permitted the defense to question the witness about the two periods of hospitalization, he did not make the records themselves available. On appeal, the Fourth Circuit reversed, stating:

> The ability of defense counsel to impeach [the witness] regarding his ability to properly perceive events about which he testified was severely limited by counsel's inability to examine the hospital records. We can think of no more relevant or significant material than a hospital record indicating that a witness who is testifying against his former employer had been under treatment for mental illness which rendered him at that time delusional and hallucinatory with poor judgment and insight.

*Id.* at 469.

The reasoning of *Society of Independent Gasoline Marketers* applies strongly in this case.

15

From Dr. Knight's limited voir dire testimony, Petitioner knew that the State's key witness, Coffey, suffered from an ongoing mental illness which was serious enough to have caused him to be hospitalized on several occasions. Petitioner suspected that Coffey's illness could have caused him to misperceive and misinterpret the words and actions of others, and might seriously have affected his ability to know, comprehend and relate the truth. Information about the treatment Coffey received, the observations made of him, and the diagnoses of his mental health were all relevant to the issue of Coffey's ability to testify truthfully and accurately. Like the defendant in *Society of Independent Gasoline Marketers*, Petitioner cross examined Coffey about his psychiatric history at length. But without Coffey's records in hand, Petitioner had no way of knowing whether Coffey's answers were truthful or what to ask him about specifically. Further, Coffey gave evasive answers to many of the questions. Coffey frequently claimed he could not remember the names of the medication he had been prescribed. For example, Coffey's response questions about the medication he was supposed to have been taking at the time of the murder were as follows:

Q:    What was the name of the kind of medication before December 8 or '94 you were taking?

A:    I don't remember the name. I know it was an antidepressant, that's all.

Q:    Do you know who prescribed it?

A:    It was a doctor prescribed it.

Q:    Well, do you know where the doctor was?

A:    Yes.

Q:    Do you know the doctor's name?

A:    No, I don't.

Vol VII, T pp. 323 line 25-324 line 9.

After finally establishing where the prescription had been made, Counsel attempted to find out when hospitalization had occurred. Coffey's recollection was as follows:

Q: Mr. Coffey, do you remember the date or the year when you were last at Cannon Hospital?

A: It was back in '80-something, I don't know.

Q: In '80-something?

A: (Witness nods head)

Vol. VII, T pp. 330 line 25-331 line 4.

Later Coffey revealed that he might have been at Cannon Hospital on another, more recent occasion:

Q: How many times have you been at Cannon—

A: Twice.

Q: --Hospital? Excuse me?

A: Twice.

Q: The other time, when was it? One was in the '80s. What about the other?

A: I think it was in — probably in 1990 when my place burned down.

Vol. VII, T p. 332 lines 10-17.

Coffey was also unable to recall the diagnoses and treatments that had been recommended for his illness. In fact, Coffey could not even recall the medications he was taking during the pendency of his testimony at Petitioner's trial. When asked what medication he was presently taking, Coffey responded as follows:

Q: What kind of medicine do you take now?

A: I've just been on it about three months for — I think it's seizures, and it's an

17

antidepressant and I take something for — hear voices, I don't know, some kind.

Q:      What do you take for hearing voices?

A:      I don't know what the name of it is.

Q:      Well, where did you get it?

A:      Psychiatrist put me on it.

Vol. VII, T p. 320 lines 11-18. Later Mr. Coffey also testified as follows:

Q:      Do you know the name — you don't know the name of it?

A:      I know one of them is Zoloft and the other one is Cogentin and I don't know what the
        other one is.

Vol. VII, T pp. 320 line 25-321 line 2.

        Given Coffey's spotty recollection and the trial court's refusal to allow access to Coffey's
records, Petitioner's counsel was forced to accept Coffey's answers, with no effective means of
testing the veracity of the responses. With access to Coffey's records, counsel would have
undoubtedly been better positioned to question Coffey about his illness and each of his
hospitalizations. Instead, the jury only heard what Coffey wanted them to hear. Defense counsel
had no way of testing Coffey's honesty and no way to refresh Coffey's recollections when he
claimed not to recall important details of his psychiatric history. Most importantly, the jury was
never given significant information to use in deciding whether Coffey's mental health status
impaired his perception and ability to testify accurately. In short, the jury was given an
incomplete picture of Coffey's past, and was left to guess how much credibility it should give to
Coffey's testimony.

        In *Society of Independent Gasoline Markers*, the Fourth Circuit held that the trial court's
*in camera* review did not go far enough; although the defendant was made aware of a period of

18

hospitalization and was allowed to cross examine on the subject, the trial court's failure to actually turn over the witness' psychiatric records was prejudicial error. No less of a prejudicial error occurred here, where Petitioner was effectively denied the opportunity to test the mental stability and veracity of the State's most important witness. For this Court to hold otherwise would be to ignore precedential case law going to back to *United States v. Sutton*, 542 F.2d 1239 (4th Cir. 1976), where the Fourth Circuit held "when the reliability of a witness may be determinative of guilty or innocence, nondisclosure of evidence that affects credibility is a denial of fundamental fairness required by the Due Process Clause of the Fifth Amendment." *Id*. at 1241-42.

### ISSUE 2: THE EXCLUSION OF COFFEY'S PRIOR INCONSISTENT STATEMENT

To further undercut Coffey's credibility, Petitioner sought to introduce a confession made by Coffey and overheard by Shawn Delp. Delp, one of Coffey's cell mates, overheard a telephone conversation in which Coffey said that Petitioner was not involved in Hartley's murder. The trial court sustained the State's hearsay objection and refused to allow Petitioner to impeach Coffey using Delp's testimony. Petitioner contends that this decision of the North Carolina courts to exclude a potentially exculpatory prior inconsistent statement made by Coffey was an unreasonable interpretation of federal law as determined in *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), *supra*.

The text of the Sixth Amendment to the U.S. Constitution provides; "In all criminal prosecutions, the accused shall enjoy the right...to be confronted with the witnesses against him..." Appropriate cross-examination of a witness is a bulwark of the constitutionally protected right of confrontation. *Davis v. Alaska*, 415 U.S. 308, 941105, 39 L.Ed.2d 347 (1974). *Delaware v. VanArsdall*, 475 U.S. 673, 106 S.Ct. 431, 89 L.Ed.2d 674 (1986). The right of

19

confrontation "means more than being allowed to confront the witness physically." *Davis v. Alaska*, 415 U.S., at 315, 94 S.Ct., at 1110. Indeed, " '[t]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.' " *Id.* at 315-316, 94 S.Ct., at 1110 (quoting 5 J. Wigmore, Evidence § 1395, p. 123 (3d ed. 1940)) (emphasis in original).

In *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), the Supreme Court reversed a murder conviction obtained where the trial court's hearsay ruling abridged the defendant's right to "present witnesses in his own defense." *Id.* at 302, 93 S.Ct., at 1049. Chambers was tried for a murder to which another person repeatedly had confessed in the presence of acquaintances. The State's hearsay rule, coupled with a "voucher" rule that did not allow the defendant to cross-examine the confessed murderer directly, prevented Chambers from introducing testimony concerning these confessions, which was critical to his defense. The Supreme Court reversed the judgment of conviction, holding that when a state rule of evidence conflicts with the constitutional right to present witnesses, "the hearsay rule may not be applied mechanistically to defeat the ends of justice," but must meet the fundamental standards of due process. In the Court's view, the State in *Chambers* did not demonstrate that the hearsay testimony in that case, which bore "assurances of trustworthiness" including corroboration by other evidence, would be unreliable, and thus the defendant should have been able to introduce the exculpatory testimony.

In this case, the trial court erroneously prevented the jury from hearing an oral statement made by Coffey which contradicted his testimony that Petitioner had accompanied him to the victim's home. Further, Coffey's statement was an admission against his penal interest, since he claimed not to committed the murder himself. And finally, the statement exculpates Petitioner

20

from involvement in the murder.

In an offer of proof, outside the presence of the jury, defense witness Shawn Delp gave the following testimony:

Q.    Mr. Delp, what if anything, did Kenneth Coffey say to you about Bobby Petitioner's involvement with Marvin or Coy Hartley's Death?

A.    He had nothing to do with it.

Q.    Did he say that to you or did you overhear that?

A.    I overheard that.

Q.    What else, if anything?

A.    That Bobby did not deserve it, but whatever he got, he deserved.

Q.    Did not deserve it?  Did he specify what?

A.    Excuse me?

Q.    You say Bobby did not deserve it.  Did Kenneth specify what he meant when he said it or when you say it?

A.    I just heard him say it.  I mean, that's all.  That's honestly all I heard.

Q.    What, if anything, did Mr. Coffey say concerning anyone else at the time, if you recall?

A.    He mentioned someone by the name of Greg.

Q.    Do you know what he said about Greg?

A.    That he was with Kenneth, that he was with Kenneth.

When Petitioner attempted to bring this testimony to the jury, the State objected, saying that there was no inconsistency in the testimony.  The trial court apparently accepted this logic and ruled to exclude the statement.  Vol. VII, T p. 1235.  The North Carolina Court of Appeals did not discuss this point of error in its opinion affirming Petitioner's conviction, but apparently simply collected it with the "remaining assignments of error" found to be without merit.

21

The trial court's exclusion of the statement from Shawn Delp cannot stand. Prior to Petitioner's proffer of the Delp testimony, Coffey had testified that Petitioner killed Hartley. When a witness' statement directly conflicts with his earlier testimony on the stand, it can be admitted into evidence for the purpose of impeaching the witness' credibility. Such evidence, offered for impeachment purposes, does not fall within the definition of hearsay, since it is not offered to prove the truth of the matter asserted. N.C.G.S. §8C-1, Rule 801. Laying a foundation by bringing the inconsistent statement(s) to the attention of the main witness is no longer required as a prerequisite to introducing the statement through other witnesses. *State v. Russell Counsel Judge*, 308 N.C. 658, 303 S.E.2d 817 (1983).

Furthermore, the trial court's refusal to permit the jury to hear this statement violated Petitioner's rights under the Confrontation Clause of the United States Constitution. Mr. Delps' testimony was that Coffey claimed that he and another person, Greg Richardson, murdered Coy Hartley. Instead of forcing the State to counter this allegation, the trial court allowed the prosecution to keep this statement from the jury.

## CONCLUSION

The prejudicial impact of each of the two constitutional violations recounted in this petition is aggravated when considered in the larger context of Petitioner's trial. When Coffey's confession overheard by Shawn Delps is combined with the excluded evidence of Coffey's competence, it becomes evident that Coffey was a thoroughly unreliable witness. Because Petitioner was effectively prevented from exercising his right to confront the key witness against him with this important evidence, he is entitled to relief from this Court.

In *Ritchie, Chavis,* and *Society of Independent Gasoline Marketers,* the State possessed evidence undermining the credibility of a key witness against the defendant. In all of these cases,

22

the defendant was prejudiced by the trial court's refusal to properly conduct an *in camera* review of the requested evidence. Likewise, Petitioner was severely handicapped in his ability to confront Coffey due to the trial court's constitutional error in not conducting an *in camera* review. In fact, this impediment to Petitioner's due process rights endures, since counsel for Petitioner is still unable to determine what information abides within Kenneth Coffey's sealed records. The trial court's error in not conducting a balancing of Petitioner's right to due process and a fair trial against Coffey's right to keep his medical and psychiatric records confidential, prejudiced Petitioner by denying him evidence which was material and favorable to his defense. The North Carolina state courts failed to uphold Petitioner's constitutional right to a fair adjudication of his case, resulting in a prejudicial and unfair trial.

For the reasons set forth in this Memorandum, the Petitioner respectfully submits that this Court should require the State to respond to this Petition, review the evidence and law, and ultimately issue its Writ of Habeas Corpus as prayed by Petitioner herein.

This September 13, 1999.

J. Phillip Griffin
Attorney for the Petitioner
North Carolina State Bar No. 14436
North Carolina Prisoner Legal Services, Inc.
Post Office Box 25397
Raleigh, North Carolina 27611
(919) 856-2200.

23