UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
NO. 5:99CV144-1-V

**F I L E D**
STATESVILLE, N.C.

FEB  4 2000

U.S. DISTRICT COURT
W. DIST. OF N.C.

| | | |
|---|---|---|
| **ROBERT CHARLES BRAGG,** | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **MEMORANDUM IN RESPONSE TO** |
| | ) | **RESPONDENT'S MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| **LOOMIS WOODARD, Superintendent,** | ) | |
| **Respondent.** | ) | |

This is a petition for a writ of habeas corpus filed by a prisoner of the State of North Carolina, pursuant to 28 U.S.C.§2254. It is before the Court on Respondents' Motion for Summary Judgment. For the reasons set forth below, Petitioner respectfully suggests that the matter is not ripe for judgment and requests that the Court order the State to supplement the record herein.

## PROCEDURAL HISTORY

On February 26, 1996, a jury in Watauga County, North Carolina, convicted Petitioner of first degree murder. Petitioner was sentenced to life in prison without parole. On February 17, 1998, the North Carolina Court of Appeals affirmed the conviction in an unpublished decision. *State v.Bragg*, No. COA97-95 (17 February 1998) (attached). Petitioner filed a petition for a writ of certiorari in the Supreme Court of North Carolina, which denied his petition without comment on June 24, 1999. *State v. Bragg*, No. 66P99 (24 June 1999).

## STATEMENT OF FACTS

Marvin "Coy" Hartley was killed in his mobile home on Thursday, December 8, 1994.

Case 5:99-cv-00144-RLV   Document 8   Filed 02/04/00   Page 1 of 58



(Trial Transcript, Vol. III, T p. 461, line 16[1]) Law enforcement began investigating the homicide that day, Vol. II, T p. 356, and the next morning the Boone Police Department and the State Bureau of Investigation (SBI) questioned Kenneth Eugene Coffey. (Vol. IV, T p. 704, line 2. Vol. II, T p. 371, lines 16-21) Coffey admitted to having detailed knowledge of Hartley's death (Vol. IV, T pp. 704, line 24 - 705, line 1), but denied any personal involvement. Instead, he claimed that Robert Charles Bragg had killed the decedent. (Vol. IV, T pp. 704-5)

Coffey's statements resulted in Petitioner's arrest in Mountain City, Tennessee, on December 10, 1994. When arrested, Petitioner gave the SBI a complete, signed statement providing detailed information concerning his whereabouts from the time he left Boone, North Carolina on the day before Harley's murder up until the time of his arrest. His statement also included the names of numerous witnesses to his alibi. (Record on Appeal, hereinafter R., pp 34 - 39)

Coffey was tried and found guilty of the murder of Coy Hartley before Petitioner's trial began. Coffey's mental state at the time of Hartley's murder and thereafter was at issue at Coffey's trial. In preparation for his trial, Coffey received a psychological evaluation which revealed that he is borderline mentally retarded, and prone to answering inquiries in a way that will place him (Coffey) in a favorable light to the questioner. (Vol. II, T p. 218) In a voir dire hearing at Coffey's trial, Dr. William Knight, a psychologist who was hired by Coffey's attorneys to examine Coffey also stated, "a person functioning at the level of intelligence which

---

[1]The Transcript of Petitioner's trial consists of volumes I-VII of Jury Selection Transcript and volumes I-IX of Transcript. All references herein to the transcript are to the I-IX volumes of the trial, exclusive of the Jury Selection Transcript.

Case 5:99-cv-00144-RLV   Document 8   Filed 02/04/00   Page 2 of 58

he (Coffey) did tends to respond in a way that a person wants them to." (Vol. II, T p. 215) (C. 610)[2]

In anticipation of receiving a new trial from the Supreme Court, Coffey had renewed negotiations with the State through which he hoped that the District Attorney might agree to accept a negotiated plea entitling Coffey to a 15- year sentence, rather than life in prison without parole, in exchange for testifying against Petitioner. (Vol. II, T pp. 250-4) Additionally, the District Attorney's office had discussed with Coffey's lawyer the possibility of interceding with the Governor on Coffey's behalf to obtain a reduction in his sentence. (Vol. II, T p. 253, lines 3-16)

At Petitioner's trial, the State's case was built around the testimony of Coffey, who testified under a grant of use immunity (R. p. 59) because he was appealing his conviction for murdering Hartley. Since no direct physical evidence tied Petitioner to the murder, Coffey's credibility was a pivotal issue at trial. Coffey had been interviewed several times by law enforcement prior to his ultimate arrest on January 6, 1995, and had given a different version of the story each time. Although Coffey first told the police that Petitioner was responsible for killing Hartley, he confessed on other occasions to sole responsibility for the crime and told cell mates that Petitioner was not involved. (Vol. V, T pp. 970, line 25 - 971 line 5; 972, lines 9-15; 975, lines 1-5; 977, lines 10-13; 980 lines 20-23)

To explore Coffey's credibility in preparation for Petitioner's trial, Petitioner attempted to obtain Coffey's medical and mental health records by subpoenas *duces tecum* to attorneys Diane Griffin and Robert West, each of whom had previously represented Coffey. Griffin

_____

[2] All references herein to the transcript of Kenneth Eugene Coffey's trial are noted as (C. ) and relevant portions are attached.

-3-

represented Coffey in a social security disability proceeding[3] and West represented Coffey

during his trial for first degree murder, which was then under appeal. To access these records,

Petitioner filed a written motion asking the trial court to "waive" Coffey's privilege concerning

the records and requesting that the trial court review the records *in camera* (attached). Petitioner

argued that Coffey waived those privileges when, at his own trial, Coffey sought to suppress his

various statements on, among other grounds, the grounds that he was "not capable of

understanding the questions he was asked in interrogation or clearly expressing himself in

response thereto, based upon reasons pertaining to his mental health . . .." (R. p. 61). The trial

court ordered that the documents be kept from Petitioner, based upon Coffey's assertion of

privilege. (Vol. II, T p. 186).

At Petitioner's trial, Coffey was asked questions by Petitioner's attorney on his mental

and medical conditions and the trial court expressly found that he had waived his

psychiatrist-patient privilege. The court then allowed Petitioner's questions, noting that the

interests of justice required that Coffey answer Petitioner's cross-examination questions about

his mental health. (Vol. II, T pp. 328-330).

Although Coffey attempted on cross examination to recount his mental health history, the

absence of his mental health records meant that many questions posed to him went unanswered.

(See generally Vol II pp. 221 - 351). Moreover, because Coffey was hesitant, ambiguous, and

was not forthcoming with information on cross examination, counsel was unable to pinpoint for

_____

[3] In a social security disability proceeding, the records obtained by the attorney likely
would have included Coffey's application, which would have described what his medical or
mental health problems were, his reading, writing, cognitive and physical ability, his
hospitalization history and who his doctors were, and how his functioning was impaired by his
disability.

-4-

the jury the length of his treatment, his diagnosis, and the medications Coffey took during the time in question. For example, Coffey could not answer questions about the medication he was supposed to have been taking at the time of the murder, (Vol II, T pp. 323 line 25-324 line 9), he could not answer questions about his prior hospitalization, (Vol. II, T pp. 330 line 25-331 line 4), and importantly, Coffey was unable to recall the diagnoses and treatments that had been recommended for his illness. In fact, Coffey could not even recall the medications he was taking during the pendency of his testimony at Petitioner's trial. (Vol. II, T p. 320 lines 11-18).

After giving notice of appeal to the North Carolina Court of Appeals, Petitioner again formally sought access to Coffey's psychiatric and medical records, in order to prepare his appeal. In a written motion, Petitioner asked the trial court to conduct an *in camera* review because Petitioner believed that the sealed records bore upon Coffey's capacity to testify as well as the truthfulness and reliability of his statements. (R.pp. 114-116)(attached). The trial court again rejected this request and instead ordered that the records remain sealed and available only for review as the appellate court deemed appropriate. (R.pp. 117-119).

In its order denying Petitioner's appeal, the North Carolina Court of Appeals, after reviewing the sealed mental health records which "related to Coffey's competency to stand trial," . . . "fail[ed] to see how the information could have benefitted the defendant as he examined Coffey about his head injury, memory loss, treatment at Broughton Hospital, and New River Mental Health Clinic, as well as about any medications he was taking ." Slip opinion, pp. 10-11. The court then held that no prejudice resulted to Petitioner and dismissed the claim.

## I. THIS PETITION WAS TIMELY FILED

The decision of the North Carolina Court of Appeals affirming Petitioner's conviction was filed February 17, 1998. On February 12, 1999, Petitioner filed a petition for certiorari with

Case 5:99-cv-00144-RLV   Document 8   Filed 02/04/00   Page 5 of 58

the North Carolina Supreme Court, which was denied June 25, 1999. On September 15, 1999 the petition for writ of habeas corpus was filed. Respondent urges that this court dismiss the petition as untimely filed pursuant to 28 USC § 2244 (d)(1). Its argument is without merit.

Where the North Carolina Court of Appeals denies relief, as it did in Petitioner's case, there are three paths that a criminal defendant has available for further review of his conviction by the North Carolina Supreme Court. First, the defendant has an appeal as of right to the North Carolina Supreme Court where the issue raised directly involves a substantial question arising under the Constitution of the United States or of North Carolina, or there was a dissent in the North Carolina Court of Appeals. N.C. Gen. Stat. § 7A-30. Second, a criminal defendant whose case does not provide a right to an appeal under N.C. Gen. Stat. § 7A-30, may seek review by the North Carolina Supreme Court by a petition for discretionary review. N.C. Gen. Stat. § 7A-31. Both appeals and petitions for discretionary review require that the defendant file a notice or petition within fifteen days of the mandate from the court of appeals (N.C. Rules of Appellate Procedure Rule 14(a),15(b)); the mandate normally issues twenty days after the opnion of the court of appeals is filed, Rule 32(b). Finally, under Rule 21 (a) (2), the North Carolina Supreme Court may "in appropriate circumstances" issue its writ of certiorari to review decisions of the Court of Appeals where the right to prosecute an appeal as of right has been lost by the failure to take timely action, as in Petitioner's case.

In order to maintain a petition for writ of habeas corpus in this court, a petitioner must exhaust the remedies available in the courts of his state. 28 USC §2254(d). In *O'Sullivan v. Boerckel*, ___ U.S. ___, 119 S.Ct. 1728, 1732 (1999), the court held that a habeas petitioner must exhaust his state remedies through "invoking one complete round of the State's established appellate review process." Here, Petitioner exhausted his state remedies by filing a petition for

-6-

writ of certiorari, raising his federal claims to the North Carolina Supreme Court February 12, 1999, prior to the expiration of his habeas limitation. The Supreme Court of North Carolina denied review without comment June 24, 1999. Under 28 U.S.C. §2244(d)(1)(A), the one-year statute of limitations began to run "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." Because the North Carolina courts regularly allow review under Rule 21(a)(2), direct review of Petitioner's claim was not completed until he had exhausted his state remedies by presentation of his claim to the North Carolina Supreme Court, thereby invoking one complete round of the state appellate process. Therefore, the September 15, 1999, application to this Court was within the one-year statute.

An alternative application of the habeas statute to his claim would exclude from the one-year limitation the one-hundred-thirty-three days his petition for a writ of certiorari was pending in the North Carolina Supreme Court, from February 12, 1999 to June 25, 1999. In an analogous situation, the Fourth Circuit Court of Appeals held that the entire time between the various stages of collateral review in state court should be excluded although no petitions were pending in any court during those times:

> Second, we believe that tolling the entire period of state proceedings upholds "[t]he principle of comity that underlies the exhaustion doctrine." *Murray v. Carrier*, 477 U.S. 478, 489, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). See *Gaskins v. Duval*, 183 F.3d 8 (1st Cir.1999) ("Applying the tolling provision encourages respect for the principle of comity and compliance with the requirement that, ordinarily, a state prisoner must first exhaust his state court remedies before seeking federal habeas relief."). We agree with the Ninth Circuit that a "contrary construction would be antithetical to the entire theory of state remedy exhaustion and would inevitably lead to the filing of protective federal petitions." *Nino [v. Galaza*, 183 F.3d 1003 (9th Cir. 1999] 183 F.3d at 1005.

*Taylor v. Lee*, 186 F.3d 557 (4th Cir. 1999).

This rationale applies with equal force to require a holding that the limitation period was

Case 5:99-cv-00144-RLV   Document 8   Filed 02/04/00   Page 7 of 58

tolled during the time the Supreme Court reviewed Petitioner's application. The federal statute had not run when Petitioner filed with the North Carolina Supreme Court. Under Rule 21 of the North Carolina Rules of Appellate Procedure, he had a remedy available in the courts of his state which he had not exhausted. To hold that the federal statute was not tolled during the time his state court petition was pending would require that prisoners file a "protective federal petition" while his claims are still under review in the state system, undermining the basic principle of comity between the state and federal courts.

Tolling the limitations period during the pendency of Petitioner's petition for certiorari results in this Petition being timely if filed before September 26, 1999. The statute of limitations began to run May 16, 1998, the date when Petitioner's time to file a petition for writ of certiorari to the United States Supreme Court expired. *Blasi v. Attorney General,* 30 F. Supp.2d 481, 485 (M.D. Pa. 1998); *United States v. Hatala,* 29 F.Supp.2d 728, 729 (M.D.W.Va. 1998).[4] There were ninety-four days remaining when Petitioner filed in the North Carolina Supreme Court February 12, 1999. The Supreme Court denied certiorari June 25, 1999. Adding back the unexpired time from the limitations period results in the statute running until September 26, 1999. Thus tolling the statute while Petitioner was exhausting his remedies in the state supreme court results in the Petition being timely filed.

---

[4]In an unpublished decision, attached hereto, the Court of Appeals for the Fourth Circuit held that for the purposes of application of the one-year statute of limitations for petitions by federal prisoners under 28 U.S.C. §2255, the judgment of conviction when a defendant has not filed a petition for certiorari with the U.S. Supreme Court became final ninety days after the decision of the Court of Appeals. *United States v. Walker*, No. 97-7854 (4th Cir. October 29, 1998).

## II. THE STATE COURTS' FAILURE TO CONDUCT AN *IN CAMERA* REVIEW OF COFFEY'S MEDICAL AND MENTAL HEALTH RECORDS VIOLATED WELL ESTABLISHED CONSTITUTIONAL PRINCIPLES AND IMPROPERLY DENIED PETITIONER ACCESS TO MATERIAL, EXCULPATORY EVIDENCE.

### A. Petitioner Made a Plausible Showing Under Federal Law That Required the Trial Court to Conduct an *in camera* review of Coffey's Mental Health Records

*Pennsylvania v. Ritchie,* 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987), mandates a balancing test between state-created privilege, such as Coffey's interest in the confidentiality of his mental health records, and the right of a criminal defendant to exculpatory evidence, such as Petitioner's right to compel evidence that serves to impeach Coffey's testimony. Under *Ritchie*, the trial court first evaluates whether the defendant has made a plausible showing that otherwise privileged materials include exculpatory evidence. Here, when Petitioner demonstrated that Coffey's competence and ability to truthfully relate a memory had been the subject of prior examinations and tests, he made a plausible showing that the records of such examinations and tests could include evidence material to his defense. Therefore, the trial court should have reviewed the records *in camera* to apply the balancing test required by the Constitution.

If the *in camera* review indicates that the materials include exculpatory evidence, then the court must weigh any claims of privilege against the accused's need to use the materials as evidence at trial. *Ritchie*, 480 U.S. at 57, n. 14, 107 S.Ct. 989. In its balancing inquiry, the court may uphold confidentiality and protect the materials from public disclosure pending a decision through the use of appropriate protective orders. *United States v. Nixon*, 418 U.S. 683, 715, n. 21, 94 S.Ct. 3090 (1973). In establishing this right to disclosure, the Supreme Court defined evidence as "material" where "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different" *Id.* (citing *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383-84 (opinion of Blackmun, J.). The Court further

Case 5:99-cv-00144-RLV   Document 8   Filed 02/04/00   Page 9 of 58

defined a "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.* Moreover, the Supreme Court's definition of "favorable" evidence is not limited to evidence tending to negate guilt, but also includes evidence tending to impeach the credibility of a key witness for the prosecution. *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).

Before Petitioner's trial began, Kenneth Coffey stood trial for the murder of Coy Hartley, and in that trial, made his mental health a key issue. In preparation for Coffey's trial, his attorneys had Coffey examined by a licensed psychologist, Dr. William Knight. Pursuant to Dr. Knight's examination, Coffey obtained his own records from Broughton Hospital. These records were turned over to Dr. Knight. In addition, Knight also gathered information regarding Coffey's past, including past admissions to Cannon Hospital and other information given to him during his evaluation of Coffey. Dr. Knight also had a report with the results of an IQ test that he conducted, which included "eleven subtests" measuring perception, 6 of which were "verbally related" and 5 of which were related to "performance or problem solving." (C. 615) Knight reported that Coffey scored lowest on tasks requiring observation and learning. (C. 616)

Coffey's attorneys used this and other information in an attempt to suppress inconsistent statements Coffey made to authorities during the investigation of his case, and to argue that he was not capable of understanding the questions he was asked during interrogation or clearly expressing himself in response to those questions. Coffey's attorneys argued that "When he [Coffey] is questioned he does not always understand the questions that are put to him. He has a tendency to fill in the gaps that he does not understand," (C. 611, 612) and that Coffey was "not capable of understanding the questions he was asked in interrogation or clearly expressing himself in response thereto, based upon reasons pertaining to his mental health." (C. 611)

Coffey's attorneys strongly questioned his ability to "tell the truth" and to relate accurately "what has transpired in the past." (C. 610)

The trial court clearly violated the mandate of *Ritchie* by denying Petitioner an *in camera* review of Kenneth Coffey's medical and mental health records. Like the defendant in *Ritchie*, Petitioner issued a subpoena *duces tecum* to obtain confidential records deemed necessary to a full and fair defense. Petitioner also filed motions requesting review and disclosure of Coffey's mental health records and alleged that the subpoenaed attorneys possessed files containing a professional psychological evaluation of Coffey performed by Dr. Knight during Coffey's own murder trial. Petitioner further alleged, upon information and belief, that these records contained important additional information bearing on Coffey's capacity to testify, as well as his truthfulness and the reliability of his statements. By specifically identifying the location of Mr. Coffey's medical and psychiatric records, as well as the type of information that might be gleaned from these records, Petitioner clearly satisfied the "plausible showing" standard established under *Ritchie*.

Moreover, it is clear that any balancing test performed by the trial court would have likely resulted in disclosure of the information to Petitioner. In *United States v. Society of Independent Gasoline Marketers of America*, 624 F.2d 461 (4th Cir. 1979), the Fourth Circuit emphasized the weight that should be accorded to the defendant, saying,

> Although a trial court should seek to prevent the disclosure of embarrassing, irrelevant information concerning a witness, it is an abuse of discretion to preclude defense counsel from obtaining relevant information, and the witness' privacy must yield to the paramount right of the defense to cross-examine effectively the witness in a criminal case.

*Id.* at 469 (citing *Davis v. Alaska*, 415 U.S. 308, 319, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

Through the arguments presented to the judge and the jury in his own trial, Coffey indisputably

-11-

waived any privilege regarding his mental health. In this earlier trial, Coffey's attorney argued

Coffey's mental illness, brain damage, and low I.Q. invalidated the "consents" and "confessions"

he had given to police investigators, thereby diminishing his culpability for the offense, and

justifying a lenient sentence. Thus, the potential harm to Coffey's privacy from disclosure of his

medical and mental health records would have been negligible compared to the prejudice visited

upon Petitioner's constitutional rights of due process and confrontation.

### B. Review of some of Coffey's records by the Court of Appeals did not cure the trial Court's Constitutional violation.

Respondent argues that the Court of Appeals' apparent review of some of the records

sealed by the trial court has now cured any violation of Petitioner's right to exculpatory evidence.

In the first place, there is nothing in the record before this Court which would establish what

materials the Court of Appeals reviewed. On appeal, Petitioner presented two issues relating to

Coffey's mental health records: (1) that the trial court erred in ruling Coffey was competent to

testify, (Slip Op. p. 5), and (2) that the trial court erred in denying his motion to waive Coffey's

privilege concerning Coffey's mental health records which were in possession of the attorneys

who previously represented Coffey, and that is was error for the trial court to refuse his request to

review those records *in camera*. (Slip Op. p. 9)

Although the Court of Appeals stated: "without deciding whether the trial court here

should have performed an *in camera* review of the documents, we have reviewed the sealed

mental health records which relate primarily to Coffey being competent to stand trial." (Slip Op.

p. 10) As far as Petitioner can discern, the court looked at only this first issue, the issue of

Coffey's competency. These arguably could have been only Coffey's Dix records, which would

have gone directly to the issue of competency. On the other hand, there could have been more of

-12-

Coffey's records reviewed by the Court, but only in relation to Coffey's competency, and not in relation to the broader issue regarding Coffey's credibility, bias, interest, understanding of his role as a witness, ability to recall, and other matters critical to the proceedings against Petitioner. It is simply impossible to tell from the Court's opinion what records it reviewed.

Certainly, the records which should have been reviewed in camera by the trial court would have included an abundance of evidence which would have undermined not only Coffey's competency, but also would have answered for the jury the question of whether Coffey's testimony was truthful and reliable. This evidence would have existed in the Court's records because of the information Dr. Knight described in his testimony and because of what kind of evidence would have been presented at a social security hearing. In fact, the records available to the Court likely related to much more than just Coffey's competency. Dr. Knight described information he had about Coffey's prior mental commitment to Broughton Hospital, his stay at Cannon Hospital, other information about his past, as well as testing conducted which would assess his capability for understanding questions and telling the truth. This testing included eleven subtests that measure perception: 6 that are verbally related and 5 that are related to performance or problem solving. (C. 615)

Further, the records subpoenaed by the trial court for review on Petitioner's appeal would have involved much more detailed information than merely Coffey's competency. As Coffey's attorney described it, "when he is questioned he does not always understand the questions that are put to him. He has a tendency to fill in the gaps he does not understand." Coffey's former teacher, Carolyn Greene also described that for a person such as Coffey with a mental handicap, memory is a problem and he could be easily confused. (C. 575)

If Coffey filled in the gaps of this case to Petitioners's detriment, when there was no

-13-

physical evidence or other strong evidence to support his assertions against Petitioner, then Petitioner should have had the opportunity to present that to the jury. Since it cannot be determined for certain which records were reviewed by the Court of Appeals, and since the issue of Coffey's veracity is of such paramount importance in this case, Petitioner respectfully requests that this Court review those records at this time.

Finally, the Court of Appeals said that there were no material evidence in the records it reviewed. However, Dr. Knight testified that Coffey would say what the questioner wants to hear, which goes directly to the question of whether Coffey's testimony was truthful and reliable. Therefore, his records are very material. It stands to reason that the Court must not have reviewed Dr. Knight's records.

## III. PETITIONER WAS PREJUDICED BY THE TRIAL COURT'S FAILURE TO CONDUCT AN *IN CAMERA* REVIEW

Coffey's testimony was a key in the State's prosecution of Petitioner, and Petitioner's attorneys repeatedly tried to obtain information upon which to illustrate to the jurors that Coffey was not able to answer questions accurately because of his serious mental health problems. Petitioner knew that the psychologist who examined Coffey found that "[w]hen he is questioned he does not always understand the questions that are put to him. He has a tendency to fill in the gaps that he does not understand," so these records were very important to Petitioner's case. (C. 611, 612) Because the sealed records in this case included materials that related directly to whether Coffey's testimony was truthful and reliable, disclosure of those records would have created a reasonable probability of a different result.

At trial, the state presented no physical evidence linking Petitioner to the crime. Only two other witnesses presented testimony linking Petitioner to the murder. The testimony of both was

-14-

highly suspect. The state's main witness was Kenneth Coffey, the very person initially suspected of committing the crime, and the person who had already been convicted of first degree murder of the same victim. At that time, Coffey, who had already been convicted for the first degree murder of Coy Hartley, was the key witness for the State. The discovery provided by the State showed that Coffey had given as many as six different statements, all of which were substantially inconsistent. However, without the records of his long history of serious mental health problems, Petitioner's attorneys had no effective means of demonstrating for the jury Coffey's inability to relate truthfully what happened the day Hartley was killed.

The Fourth Circuit Court of Appeals consistently has held that the trial court's failure to review and disclose information impacting on the credibility of a key government witness constitutes a constitutional violation. In *Chavis v. North Carolina*, 637 F.2d 213 (4th Cir.1980), the Court determined that suppression of psychiatric records of two of the prosecution's crucial witnesses denied the defendants' due process rights in light of their specific request for "psychiatric or other reports which might tend to reflect on the credibility or competency of ... prospective witnesses." *Id*. at 224-25. The undisclosed psychiatric reports at issue in *Chavis* revealed that the witness had "an IQ of 82 placing him in the range of borderline defective" and, the court reasoned, "may have [had] some bearing on the witness' ability to recall in minute detail events that occurred at least one and one-half years prior to the time he was testifying." *Id*. at 219-220.

As in *Chavis*, Kenneth Coffey was the most important prosecuting witness. Coffey's testimony constituted the very foundation of the State's case against Petitioner. Like the witness in *Chavis*, Coffey functioned at a borderline intellectual level. Testimony in Coffey's own trial revealed that he had a low IQ of only 60. (C. 608) The impeachment materials that might have

-15-

been gleaned from Coffey's mental health and medical records could have provided the weapons

for Petitioner to attack Coffey's credibility, which was the heart of the State's case against

Petitioner.

Given Coffey's spotty recollection and the trial court's refusal to allow access to Coffey's

records, Petitioner's counsel was forced to accept Coffey's answers, with no effective means of

testing the veracity of the responses. With access to Coffey's records, counsel could have

questioned Coffey specifically about his illnesses which could have affected his ability to

remember; what medications he took at the time of the crime and during his testimony; and each

of his several hospitalizations. Instead, the jury only heard what Coffey wanted them to hear,

and what his counsel, who coached him throughout his testimony, wanted them to hear.

For example:

Q:    On December 8 of '94 were you taking that kind of medicine?

A:    I ain't for sure. They had me on two or three different kinds of medicine.

Q:    Were you supposed to be taking that kind of medicine on December 8 of '94?

A:    I know they put me on it when I was — and they changed it again. I went to see the

      doctor up here, so ---

Q:    On December 8 of '94 do you know if you were supposed to be taking any medicine?

A:    I guess I was, but I don't remember if I took anything or not. I know I was supposed to

      be taking it.

Q:    Who helps you keep up with— who back then was helping you keep up with your

      medicine?

A:    Pam or whoever at work brings it to me.

Q:    Who? I'm sorry, I didn't hear what you said.'

-16-

A: The head jailer over there, the jailer.

Q: I'm talking about on December 8 of '94.

A: Oh, '94? I wasn't even on no medicine in '94.

Q: Had you been on medicine of that kind before December 8 of '94?

A: Yeah, but it's been a couple of years before that.

Q: And you just quit taking that on your own?

A: Yeah. Well, I couldn't afford to pay for it, yeah.

Q: And was that medicine for voices?

A: No, huh-uh.

Q: Was it medicine that had been prescribed by a psychiatrist?

A: Huh-uh.

Q: What was the name of that kind of medicine before December 8 of '94 you were taking?

A: I don't remember the name. I know it was an antidepressant, that's all.

Q: Do you know who prescribed it?

A: It was a doctor prescribed it.

Q: Well, do you know where the doctor was?

A; Yes.

Q: Do you know the name of the doctor?

A: No, I don't.

(Vol. II, T pp. 322 - 324)

Defense counsel had no way of testing Coffey's honesty and no way to refresh Coffey's

recollections when he claimed not to recall important details of his psychiatric history. Most

importantly, the jury was never given significant information to use in deciding whether Coffey's

-17-

mental health status impaired his perception and ability to testify accurately. In short, the jury had no way to understand Coffey's testimony, and had no way of knowing how much credibility it should give to Coffey's testimony. Therefore, Petitioner was prejudiced by the trial court's failure to conduct an *in camera* review.

## CONCLUSION

In a case very similar to this one, the Court of Appeals for the Fourth Circuit reversed a district court's dismissal of a habeas petition which was based upon the refusal of a state trial court to conduct an *in camera* review of the privileged records of a prosecuting witness. After determining that the petitioner had been entitled to such review, the Court of Appeals was faced with the need to fashion an appropriate remedy. Rather than order a new trial without a showing that the records contained exculpatory material, the court instead directed the district court to conduct the review itself:

> The court should secure the materials we have identified as those to which the petitioner has sufficiently shown a right to in camera inspection, either by voluntary production by the state or by such processes of the court as are required. The court should then inspect the materials in camera and make the determination required by *Ritchie*, sealing the materials inspected for such appellate review as may be required. The court should then take such remedial or other action as is required by its determination. If the court determines that the agency records we have identified contain information that probably would have changed the outcome of [Petitioer's] trial, the writ should issue, either absolutely or conditioned upon the state's providing a new trial, as the district court deems proper. If the materials contain no such information or if the nondisclosure was harmless beyond a reasonable doubt, the court will be free to reinstate its dismissal of the petition. See *Ritchie*, 480 U.S. at 58, 107 S.Ct. at 1001-02 (directing comparable remedial proceedings in remanding to state court on direct appeal).

*Love v. Johnson,* 57 F.3d 1305, 1316, (4th Cir. 1995).

It is respectfully submitted that this Court should follow the procedure mandated in *Love*, *i.e.*, obtain the files which were the subject of Petitioner's subpoena at his trial, and inspect them to determine if they contain information that would tend to undermine confidence in the outcome

-18-

of the trial. Following such inspection the Court will then make such orders as it finds appropriate.

This February 3, 2000.

J. Phillip Griffin, Attorney for Petitioner
N.C. Bar No. 14436
North Carolina Prisoner Legal Services, Inc.
Post Office Box 25397
Raleigh, N.C. 27611
(919)856-2200

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of Petitioner's Memorandum in Response to Respondent's Motion for Summary Judgment has been this day served by first class mail upon the following:

Clarence DelForge, III
Assistant Attorney General
Post Office Box 629
Raleigh, North Carolina 27602

This February 3, 2000.

J. Phillip Griffin

Case 5:99-cv-00144-RLV   Document 8   Filed 02/04/00   Page 19 of 58

*22 165 F.3d 22

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Courts's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA4 Rule 36 for rules regarding the publication and citation of unpublished opinions.)

**UNITED STATES of America, Plaintiff-Appellee,**
**v.**
**Jerome WALKER, Defendant-Appellant.**

No. 97-7854.

United States Court of Appeals, Fourth Circuit.

Oct. 29, 1998.

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk. Rebecca B. Smith, District Judge. (CR-94-133, CA-97-758-2)

Jerome Walker, Appellant Pro Se.

Kevin Michael Comstock, Office of the United States Attorney, Norfolk, Virginia, for Appellee.

Before MURNAGHAN and MOTZ, Circuit Judges, and HALL, Senior Circuit Judge.

OPINION

PER CURIAM.

Appellant appeals the district court's order dismissing his motion filed under 28 U.S.C.A. § 2255 (West 1994 & Supp.1998), as barred by the one-year limitation period imposed by the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214 (effective Apr. 24, 1996). Section 2255 states that petitioners for collateral relief have one year from "the date on which the judgment of conviction becomes final" to file a motion under that statute. Appellant's § 2255 motion was dated July 28, 1997, and filed July 31. Because the district court found that Appellant's judgment became final on the date of this court's affirmance of his convictions and sentence (July 25, 1996), the district court dismissed Appellant's motion as untimely.

However, a conviction becomes "final," for purposes of § 2255, on the date when the petitioner could no longer seek direct review. *See United States v. Simmonds,* 111 F.3d 737, 744 (10th Cir.1997) (deciding that conviction became final after the Supreme Court denied certiorari); *see also* 28 U.S.C.A. § 2244 (West 1994 & Supp.1998) (providing, for motions attacking state court convictions, that a judgment becomes "final by the conclusion of direct review or the expiration of the time for seeking such review"). An appellant's direct review procedure terminates when his or her petition for certiorari is denied or when the deadline for seeking a writ of certiorari has expired. *See Lambrix v. Singletary,* 520 U.S. 518, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997) (determining finality for purposes of *Teague v. Lane* ); *Allen v. Hardy,* 478 U.S. 255, 258 n. 1, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986) (same).

Because Appellant did not file a petition for a writ of certiorari, his judgment was not final until 90 days after this court rendered its opinion, or October 23, 1996. *See* Sup.Ct. R. 13(1). Appellant's motion was, therefore, not time barred, as he indisputably filed it before the October 23, 1997, deadline. Accordingly, we grant a certificate of appealability, vacate the district court's order, and remand for further proceedings. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

*VACATED AND REMANDED*

Copyright (c) West Group 2000 No claim to original U.S. Govt. works

NO. COA97-95

NORTH CAROLINA COURT OF APPEALS

Filed: 17 February 1998

STATE OF NORTH CAROLINA

v.                                                    Watauga County
                                                     No. 94 CRS 4929

ROBERT CHARLES BRAGG


Appeal by defendant from judgment entered 26 February 1996 by Judge Charles C. Lamm, Jr. in Watauga County Superior Court. Heard in the Court of Appeals 19 November 1997.

Attorney General Michael F. Easley, by Special Deputy Attorney General Daniel F. McLawhorn, for the State.

Jeffrey M. Hedrick for defendant-appellant.

WALKER, Judge.

Defendant was tried capitally for the murder of Marvin "Coy" Hartley (decedent), was found guilty of first degree felony murder and was sentenced to life in prison without parole.

The State's evidence tended to show that on 8 December 1994, decedent's body was found face down on the floor in his mobile home by a neighbor. The neighbor called 911 and Detectives Harrison and Shook of the Boone Police Department responded to the call. At the crime scene, Detective Shook saw blood splattered on the curtain, the wall, the bed, and on a ceiling beam. There was also a pool of blood underneath decedent's face.

The pathologist determined that decedent died as a result of blunt trauma to the head, with the fatal injuries consistent with what one would expect from a trailer hitch ball swung in a sock.

Two days before the murder on 6 December 1994, defendant and Kenneth Coffey (Coffey) were arrested for public intoxication a quarter of a mile from the decedent's trailer park. During a search of the defendant, the police seized a bottle of liquor, a knife and a white athletic sock containing a trailer hitch ball. When asked about the trailer hitch ball, defendant stated: "I never know when I might need to use it on someone." Defendant and Coffey were released to their friend Monroe Brown (Brown) an hour after their arrest and all their possessions, including the trailer hitch ball, were returned. The three then went to drink beer and Brown advised defendant to leave town due to defendant's numerous police detentions. Defendant replied he would spend the night with decedent and leave town the next day, Wednesday, 7 December 1994.

Defendant and Coffey parted company for a few hours before meeting up at decedent's trailer at 3:00 a.m. on 7 December 1994, where they stayed until 7:00 a.m. After leaving the trailer, defendant and Coffey purchased wine which they drank in the A&P parking lot. According to phone records introduced at trial, at 1:14 p.m. defendant called his sister in Tennessee asking for money. The two then went to another trailer in decedent's trailer park where they continued drinking. Bonnie Jean Crawley, who lived in decedent's trailer park, spoke with defendant and Coffey about 5:00 p.m. on 7 December and noticed that both had been drinking.

Coffey saw defendant in Boone with Greg Richardson around 9:00 a.m. on 8 December 1994. Later that afternoon, Coffey took a twelve-pack of beer to decedent's trailer. When Coffey and decedent finished the beer, decedent gave Coffey money and asked him to go buy a bottle of liquor.

Coffey bought a bottle of vodka and on his way back to the trailer, Coffey met defendant at the mailboxes in front of the trailer park. Defendant asked if the decedent was drunk and if decedent had any money on him as he was known to carry large sums of cash. Defendant finally convinced Coffey to help him rob the victim. Renee Nelson and her 10-year-old son both testified that they saw defendant and Coffey walk to the decedent's trailer late in the afternoon of 8 December 1994.

After they went inside, decedent got angry with defendant and wanted him to leave. After Coffey slapped the decedent with his hand, the defendant "went mad and started beating him" with something in a white sock he pulled out of his pocket. Defendant beat the decedent in the forehead four or five times. Coffey saw blood splatter on the curtains, floor, and bed when the defendant struck the decedent.

The decedent's wallet fell to the floor and Coffey and the defendant divided the money. Coffey panicked, fled the trailer park, and called Shirley Faircloth to pick him up. Defendant ran past Coffey as he was waiting for his ride and told Coffey to keep his mouth shut.

The police picked up Coffey on 9 December 1994 and he gave a statement implicating defendant and Joe Cothren. On 10 December 1994, defendant was arrested on a fugitive from justice warrant in Mountain City, Tennessee (25 miles from Boone). When apprehended, defendant had the trailer hitch ball in his coat pocket.

Thereafter, during the course of several interviews, Coffey gave several varying statements to the police. He signed all the statements as true except his last statement which his lawyer advised Coffey not to sign without him being present. While some details varied in the different statements, the defendant's role in the murder remained a common fact throughout Coffey's recitations of what happened.

Defendant's evidence tended to show that upon arrest, defendant gave the State Bureau of Investigation a complete signed statement denying his presence in Boone around the time of decedent's death and providing detailed information about his whereabouts from the time he left Boone at approximately 3:00-4:00 p.m. on 7 December 1994 until the time of his arrest, including names of alibi witnesses.

At trial, defendant presented the testimony of alibi witnesses who placed defendant in Mountain City, Tennessee at the time of decedent's murder. Defendant further presented evidence that during the time period after decedent's death defendant had no money.

Defendant first argues that the trial court erred in ruling that the State's accomplice witness, Coffey, was competent to testify.

N.C. Gen. Stat. § 8C-1, Rule 601 (1992), concerning the competency of a witness to testify, provides in pertinent part:

> (a) General Rule. Every person is competent to be a witness except as otherwise provided in these rules.
>
> (b) Disqualification of witness in general. A person is disqualified to testify as a witness when the court determines that he is (1) incapable of expressing himself concerning the matter as to be understood, either directly or through interpretation by one who can understand him, or (2) incapable of understanding the duty of a witness to tell the truth.

This rule applies even if a witness suffers from a mental illness.

Our Supreme Court in *State v. Benton*, 276 N.C. 641, 650, 174 S.E.2d 793, 799 (1970) stated:

> Unsoundness of mind does not per se render a witness incompetent, the general rule being that a lunatic or weakminded person is admissible as a witness if he has sufficient understanding to apprehend the obligation of an oath and is capable of giving a correct account of the matters which he has seen or heard with respect to the questions at issue.

Mental conditions which fall short of complete incapacity may, however, affect the witness' credibility which is an issue for the jury and not the court. *State v. Fields*, 315 N.C. 191, 204, 337 S.E.2d 518, 526 (1985). Further, the determination of a witness' competency to testify "'rests in the sound discretion of the trial judge in the light of his examination and observation of the particular witness.'" *State v. Hicks*, 319 N.C. 84, 89, 352 S.E.2d

424, 426 (1987). Absent a showing that the trial court's ruling could not have been the result of a reasoned decision, the ruling must stand on appeal. *Id. See also State v. DeLeonardo,* 315 N.C. 762, 340 S.E.2d 350 (1986)(No abuse of discretion where trial court found 12-year-old with low I.Q. competent to testify); *State v. Rhodes,* 321 N.C. 102, 361 S.E.2d 578 (1987); *State v. Rael,* 321 N.C. 528, 364 S.E.2d 125 (1988); *State v. Spaugh,* 321 N.C. 550, 364 S.E.2d 368 (1988).

Defendant argues that because "all the evidence tended to show that Coffey would not follow his oath" the trial court abused its discretion in finding Coffey competent to testify.

Here, the trial court held a competency hearing, outside the presence of the jury, where it heard testimony from Coffey and from psychologist Dr. William Knight, who evaluated Coffey for the purposes of Coffey's criminal trial. Moreover, the trial court also had before it the file from Coffey's trial, which included a mental health report from Dorothea Dix Hospital.

Dr. Knight testified that in his opinion, based on a forty-five minute interview with Coffey and a review of the results of an intelligence test, Coffey would have a difficult time understanding all but simple questions and that Coffey would answer in a manner that would tend to put him in the best light.

Coffey testified that as a result of prior injuries, he had two steel plates in his head and he occasionally suffered from memory loss. However, he also testified that his memory has improved, he knew why he was in court, he understood that the

reason for giving an oath on the Bible is to tell the truth and that he can tell the difference between right and wrong. Moreover, the report from Dorothea Dix showed that Coffey was capable of proceeding in his own trial.

From the above evidence the trial court, with respect to Coffey's competency, concluded:

> Mr. Coffey is capable of expressing himself concerning matters about which he is to be questioned, that he understands the duty of a witness to tell the truth and understands the meaning of taking the oath, and based upon those conclusions finds that Mr. Coffey is competent...to testify in this matter.

As the evidence presented supports the trial court's conclusions regarding Coffey's competency to testify, we find no showing of an abuse of discretion and defendant's assignment of error is overruled.

Defendant next argues that the trial court erred in limiting the admissibility of defense witness Jonathan Harmon's printed statement concerning Coffey's admissions as the statement constituted a past recollection recorded.

Harmon testified about a conversation he had with Coffey which occurred while they were both incarcerated in the Watauga County jail. Coffey discussed the robbery and murder of the decedent with Harmon but never mentioned that defendant was involved. During Harmon's testimony, he identified Defendant's exhibit 25 as the written statement he had given to the police concerning his conversation with Coffey. While Harmon testified that this written statement was accurate and complete, it contained more details than

Harmon's trial testimony. Defendant contends the details contained in the written statement should have been admitted as substantive evidence under the "past recollection recorded" exception to the hearsay rule.

Regardless of whether the written statement meets the test for admissibility under N.C. Gen. Stat. § 8C-1, Rule 803 (5)(1992) "Recorded recollection," defendant did not object to the trial court's limitation that the written statement would be "allowed for the purpose of corroborating the witness." Further, the defendant never requested that the written statement be admitted for any purpose other than corroboration. As such, defendant failed to properly preserve this issue for review by this Court. Nevertheless, we conclude the trial court did not err in admitting Harmon's statement for corroborative purposes only.

Defendant next asserts that the trial court erred in refusing to allow defendant to offer evidence of his cooperativeness after he was arrested.

Defendant gave a statement to law enforcement in which he denied any involvement in decedent's murder and indicated that he was in Tennessee on 8 December 1994. When defendant attempted to elicit from the State's law enforcement witness that defendant's statement was voluntarily given, the trial court sustained the State's objection. Defendant argues that as flight can be evidence of guilt, cooperativeness can be evidence of innocence.

The exclusion of evidence under N.C. Gen. Stat. § 8C-1, Rule 403 (1992) lies within the sound discretion of the trial court, and

such a ruling may only be reversed upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision. *State v. Jones*, 89 N.C. App. 584, 367 S.E.2d 139 (1988). Here, defendant has not shown the trial court's decision to exclude this testimony was arbitrary in light of the fact that there was evidence that defendant cooperated with law enforcement, waived extradition, and volunteered to come back to Boone. The trial court did not abuse its discretion in this instance and defendant's assignment of error is overruled.

Defendant next contends that the trial court erred in denying defendant's motion to "waive" Coffey's privilege concerning Coffey's mental health records which were in the possession of the attorneys who had previously represented Coffey. Defendant further contends it was error for the trial court to refuse the defendant's request to review these records in camera.

Defendant served a *subpoenas duces tecum* on attorneys Diane Griffin, who represented Coffey in a social security proceeding, and Robert West, who represented Coffey in his criminal murder trial. Defendant sought to obtain all the records maintained by Griffin and West in their representation of Coffey. Defendant then moved the trial court to waive Coffey's attorney-client, physician-patient, psychologist-client/patient, and counselor-client privileges.

Defendant argued that Coffey had waived any privilege in Coffey's criminal trial by raising the issue in that trial that Coffey's mental illness, brain damage, and low I.Q. invalidated his

"confessions" and diminished his culpability for the offense. Further, defendant argues that the trial court, in balancing the various interests, should have overcome any privilege in the interest of justice, and reviewed the records before quashing defendant's subpoenas and sealing the records for appeal.

After considering the matter, the trial court ruled that "any privilege with regard to Dr. Knight's testimony or anything upon which Dr. Knight reviewed and relied upon in his testimony has already been waived and continues to be waived..." and would be available to the defendant. Citing a lack of information as to whether any information held by Griffin or West had been used at Coffey's trial, the trial court ruled there was insufficient evidence to encroach further upon the attorney-client privilege. Moreover, the trial court stated that the matter would be reconsidered if the defendant developed evidence indicating Coffey's use of attorney-held mental health information in Coffey's trial. The mental health records in the possession of Griffin and West were sealed and placed in the file for a later in-camera review.

We first note that the trial court is in the best position to determine whether the exclusion of such information would be prejudicial to a defendant and ordinarily should perform an in-camera review of documents. Without deciding whether the trial court here should have performed an in-camera review of the documents, we have reviewed the sealed mental health records which relate primarily to Coffey being competent to stand trial. We fail

to see how this information could have benefitted the defendant as he examined Coffey about his head injury, memory loss, treatment at Broughton Hospital, and New River Mental Health Clinic, as well as about any medications he was taking. As no prejudice resulted to the defendant due to the failure of the trial court to inspect the documents in camera, we find this assignment of error to be without merit.

Lastly, defendant argues that the trial court erred in denying defendant's challenge for cause of juror McNeely based on her inability to follow the law.

In order to preserve a denial of a challenge for cause, the defendant must follow the procedure set out in N.C. Gen. Stat. § 15A-1214(h) by "(1) exhausting his peremptory challenges, (2) renewing his challenge for cause..., and (3) having that renewed challenge denied by the trial court." *State v. Cunningham*, 333 N.C. 744, 746, 429 S.E.2d 718, 719 (1993). Here, the State concedes that the defendant properly preserved this issue for appeal.

Generally, the trial court's ruling on a challenge for cause will not be disturbed on appeal absent a showing that the trial court abused its discretion in making such ruling. *Id.* at 754, 429 S.E.2d at 723. Nonetheless, where a prospective juror's answers show he "could not follow the law as given," it is error for the trial court not to excuse the juror. *Id.* (*citing State v. Hightower*, 331 N.C. 636, 641, 417 S.E.2d 237, 240 (1992)).

The following exchange took place during jury selection between defendant's attorney and juror McNeely concerning the defendant's right to be presumed innocent until proven guilty by the State:

Mr. Hedrick: Ms. McNeely, do you feel that you can continue to give Mr. Bragg the presumption of innocence even if he doesn't testify?

Ms. McNeely: That's real hard for me to answer that question.

Mr. Hedrick: Is that because you're afraid that you may hold that against him in not testifying?

Ms. McNeely: I don't know whether I'd hold it against him or not, but I just--you know, if he's not guilty, I feel like he might want to prove hisself [sic].

. . .

The Court: The law is, since the burden of proof is on the State, the law is that the defendant does not have to testify or present any evidence and that it cannot be held against him. It's up to the State instead to prove beyond a reasonable doubt guilt. If they fail in that, it's the jury's duty to find the defendant not guilty. The defendant has no burden of proof; therefore, he has no obligation to testify in his own behalf or to present any evidence, and that under the law cannot be held against him. Do any of you have a problem with that concept of our law?

Ms. McNeely: No.

Mr. Hedrick: If chosen as jurors, can you follow that[?]

Ms. McNeely: Yes.

. . .

Mr. Hedrick: Ms. McNeely, are you truly comfortable that that would not interfere with your ability to fairly follow the law and to--

Ms. McNeely: I guess I listened to too much of the O.J. Simpson case. I'm sorry, but I think I probably did.

Mr. Hedrick: Well, there was plenty of it to hear.

Ms. McNeely: Yeah, and I'm sorry, I probably did, and you hear all that kind of thing and you wonder. But I understand what the judge is saying and I don't--you know, I think I could-- you know, I wouldn't hold it against him.

Mr. Hedrick: Okay. So you don't think that if it happened that Mr. Bragg did not testify, you don't think that that would interfere with your ability to presume him innocent?

Ms. McNeely: I can't say yes to that question.

Mr. Hedrick: Challenge for cause.

The Court: Denied.

Mr. Hedrick: When you say you can't say yes to the question, would you explain what you mean[?]

Ms. McNeely: I know what the judge is saying, and this may sound stupid to you lawyers, but if a person is innocent, they should have no problem getting up and saying they are, and they don't have to prove it--

The Court: Ma'am, do you understand that if the State were to present their evidence and the defendant, whether presenting evidence or not, did not testify himself and you had a reasonable doubt after hearing the State's evidence as to his guilt, would you nevertheless have some inclination to find him guilty because he did not testify?

Ms. McNeely: No, no.

The Court: Would you find him not guilty because the State had failed to prove the case beyond a reasonable doubt?

Ms. McNeely: Well, maybe I don't understand the question. What I'm saying is, I guess if the judge-- if the lawyers do a good job, then, you know, I have no problem with that, you know, if the evidence is right there.

The Court: But I mean, if the State-- if after hearing the evidence you had a reasonable doubt as to the defendant's guilt, would you find him not guilty whether or not he testified, understanding that it's the State's requirement-- the law is that if the State fails to prove guilt beyond a reasonable doubt, it's the jury's duty to find the defendant not guilty? The State has...

Ms. McNeely: Are you asking me if I'd say he's not guilty? Is that what you're asking?

The Court: If you had a reasonable doubt after hearing the evidence, even though he did not testify himself?

Ms. McNeely: No.

The Court: I'm not sure that you understand--

Ms. McNeely: I don't understand what you're saying, I don't think.

The Court: The State has the burden to prove guilt of any criminal defendant beyond a reasonable doubt.

Ms. McNeely: Right.

The Court: If they fail to do that, it's the jury's duty to find the defendant not guilty.

Ms. McNeely: Right.

The Court: And that's so whether or not the defendant testified in his own behalf or whether he chose not to testify, whether he presented evidence in his own behalf through other witnesses or whether he chose not to present any evidence.

Ms. McNeely: Right.

The Court: The burden is on the State.

Ms. McNeely: Right.

The Court: The defendant has no burden whatsoever. And so what I'm asking is, if after hearing the evidence you had a reasonable doubt of the defendant's guilt, would you find him not guilty?

Ms. McNeely: If I had a reasonable doubt that he was guilty?

The Court: Uh-huh.

Ms. McNeely: No, I wouldn't find him-- I would find him guilty, yes.

The Court: You would find him guilty if you had a reasonable doubt that he was guilty?

Ms. McNeely: If there's any reasonable doubt that I think this person is guilty, I'm not going to say they're not guilty.

The Court: Okay. Well, now, listen to what I'm saying.

Ms. McNeely: Maybe I can't--

The Court: I'm saying, if you have a reasonable doubt as to his guilt, it would be your duty to find him not guilty, if you had a reasonable doubt.

Ms. McNeely: Right, yes, yes.

The Court: Is that what you're saying?

Ms. McNeely: Yes.

The Court: Okay.

Ms. McNeely: I'm getting confused.

The Court: And whether or not he chose to testify or whether or not he chose to present any evidence at all, would that affect that decision?

Ms. McNeely: I would not find this person guilty unless I had enough evidence. Does that answer your question?

The Court: Yes, ma'am.

Ms. McNeely: Okay.

The Court: Whether or not he testified?

Ms. McNeely: Right.

The Court: Or whether or not he presented any evidence?

Ms. McNeely: Right.

The Court: Okay. Thank you, ma'am.

Mr. Hedrick: Ms. McNeely, I don't want to belabor this, but let me ask you another question that's very similar. If Mr. Bragg didn't testify, decided that he didn't want to testify, would you consider that against him in any way that might cause you to want to find him guilty when you're thinking about the question of whether there is a reasonable doubt?

Mr. Rusher: Objection.

The Court: Sustained.

Mr. Hedrick: Ms. McNeely, would you be concerned about your ability to follow the Court's instructions if Mr. Bragg did not want to offer evidence or testify.

Mr. Rusher: Objection.

The Court: Overruled.

Ms. McNeely: I don't know how to answer except to tell you that this is real serious to me, my decision that I make and all the evidence that you find. If I think the person is guilty, I'm not going to say that he is not guilty, or -- you know what I'm saying? I don't know how to say it in lawyer terms. I just know that the evidence would have to be there for me to say guilty or not guilty.

Mr. Hedrick: Do you feel like that you'd have to have some evidence to satisfy you that he is not guilty?

Ms. McNeely: Well, aren't we going to have some evidence?

Mr. Hedrick: Well -- but the evidence has to be evidence that proves that he is guilty. Do you understand what I'm saying?

Ms. McNeely: Yes.

Mr. Hedrick: And you have said earlier that you would expect the State to prove that to you, right?

Ms. McNeely: Yes.

Mr. Hedrick: Okay. And if the State had offered some evidence that might tend to show some involvement or some guilt, if the State offered that, you'd listen to it right?

Ms. McNeely: Of course I'd listen to it, but it would have to be -- you know, I'd have to know for sure that it would -- I mean, it would totally cause-- you know what I'm saying? It would have to cause that act.

Mr. Hedrick: And if you believe from what the State showed you that Mr. Bragg was probably guilty but not necessarily beyond a reasonable doubt --

Ms. McNeely: I would have to know that he was guilty in my heart before I would say guilty.

Mr. Hedrick: Okay. And after you'd heard that State's evidence about his guilt, you wouldn't come to a conclusion until --

Ms. McNeely: Not from that, no.

Mr. Hedrick: You wouldn't come to a conclusion until you heard all the evidence, would you?

Ms. McNeely: Right.

Mr. Hedrick: Okay. And would you at some point expect or in your mind feel that you

would be requiring Mr. Bragg to show you
something?

Mr. Rusher: Objection.

The Court: Overruled.

Ms. McNeely: No. No, not when you put it like
that.

Mr. Hedrick: Okay. Now, will you explain to
me -- I'm not sure I understood what you said
about what concerns you if Mr. Bragg were to
elect not to testify.

Ms. McNeely: Well, I guess after the judge
explained it to me that he doesn't have to
prove anything, maybe I didn't, you know, know
that. I just always thought that if the
person was not guilty and he'd testify if it
was better for him. I guess it's just one of
those things I've always heard. You know,
it's nothing -- I don't know.

Mr. Hedrick: So if he didn't testify, that
wouldn't give you any problem with following
the law now?

Ms. McNeely: No.

Mr. Hedrick: Okay....

. . .

Mr. Hedrick: Ms. McNeely, I'm going to ask you
one more time if you are certain, considering
the seriousness of this case and the fact that
-- I'm getting close to quitting these
questions -- are you comfortable that you will
not feel some urge or need to hold against Mr.
Bragg the fact that he may not testify?

Mr. Rusher: Objection.

The Court: Overruled.

Ms. McNeely: I can't answer that question. I
mean, I don't know what to say. I don't think
so, but -- you know, I don't think it would
make any difference if the State proved him
one way or the other whether he testified or
not, but I can't say for sure.

Mr. Hedrick: Your honor, I'd renew that challenge.

The Court: Motion is denied.

Mr. Hedrick: So you can't answer my question either way?

Mr. Rusher: Objection.

The Court: Sustained.

Mr. Hedrick: Are you saying there's a possibility that you may hold it against Mr. Bragg if he didn't testify?

The Court: The objection is sustained. Ms. McNeely, are you able to follow the law as the Court instructs you in that regard?

Ms. McNeely: Yes, sir.

Defendant relies on *State v. Cunningham* in support of his argument that the trial court incorrectly denied his challenge for cause of juror McNeely. In *Cunningham*, the trial court refused to excuse a prospective juror for cause. Our Supreme Court found that juror Carnes, "[a]fter a great deal of explanation from the trial court, ...ultimately stated that she understood that defendant was not required to prove his innocence." *Cunningham*, 333 N.C. at 754, 429 S.E.2d at 723. After viewing the entire *voir dire*, the Court then found the juror's responses demonstrated "either confusion about, or a fundamental misunderstanding of, the principles of the presumption of innocence or a simple reluctance to apply those principles should the defense fail to present evidence of defendant's innocence" and thus affected her ability to give the defendant a fair trial. *Id.*

The Supreme Court further noted that it was aware that the facts in *Cunningham* were similar to the facts in *State v. McKinnon* where it had found no error in the trial court's denial of a challenge for cause. In *McKinnon,* a prospective juror likewise "expressed some confusion as to the defendant's presumption of innocence, and gave ambiguous answers to questions about whether she would hold the State to its burden of proof." *Cunningham,* 333 N.C. at 755, 429 S.E.2d at 723. However, the Court noted that *McKinnon* was distinguishable because the juror there, "'ultimately agreed three times that if the State did not meet its burden of proof she could find the defendant not guilty even though he presented no witnesses in his behalf.'" *Id. (quoting State v. McKinnon,* 328 N.C. 668, 677, 403 S.E.2d 474, 479 (1991)).

We find the facts of the instant case to be more similar to those of *McKinnon.* Here, juror McNeely initially expressed some confusion about the law concerning defendant's presumption of innocence. However, she never stated expressly that she would hold it against defendant in determining whether there was a reasonable doubt as to his guilt. More importantly, on more than one occasion juror McNeely showed an understanding of the law as explained to her by the trial court and stated unequivocally that she would be able to follow the law. As such, we will not disturb the trial court's ruling denying defendant's challenge for cause.

We have carefully reviewed defendant's remaining assignments of error and find them to be without merit. We hold the defendant received a fair trial free from prejudicial error.

No error.

Judges LEWIS and TIMMONS-GOODSON concur.

Report per Rule 30(e).

Q. And the defendant cut three loads of wood?

A. Most days they cut three loads of wood and split it up and hauled it in, and I paid them $35.00 a load.

Q. So as you paid the defendant -- He cut three loads of wood. How much money did you give him?

A. Well I paid them every day. They cut most every day when they was cutting. $35.00 a load and they split the money up, him and T.J. Carson.

Q. So he did have money ---

A. (Interrupting)- Yeah.

Q. (Continuing)--- during that period of time because you paid him?

A. Yeah, he had the money. I paid him every day.

Q. I have no further questions.

        MR. WILSON: Thank you.

WILLIAM KNIGHT, being first duly sworn, testified under the Direct-Examination by Mr. West:

Q. State your name, please?

A. William Knight.

Q. You are Doctor Knight, are you not?

A. Yes, sir.

Q. Do you teach at the university?

A. I am retired from the university.

Q. Appalachian State University?

A. Yes, sir.

1 Q. How many years did you teach at Appalachian State?

2 A. I think twenty-six.

3 Q. And what did you teach at Appalachian State?

4 A. I taught psychology.

5 Q. What is your educational background, Doctor Knight?

6 A. I was graduated with a degree in psychology from

7 Michigan State University and have since taken additional

8 work from several different universities.

9 Q. Is your PH.D from Michigan State?

10 A. Yes, sir.

11 Q. Did you teach any place else other than Appalachian

12 State University?

13 A. Yes, sir. I taught at the University of South

14 Carolina and Ohio State University, also at Michigan

15 State.

16 Q. Are you familiar with or have you ever seen the

17 defendant?

18 A. Yes, sir.

19 Q. Since you retired from the university have you been

20 practicing psychology?

21 A. Yes, sir.

22 Q. Do you do psychological testing?

23 A. That is correct.

24 Q. You also do consulting, do you not?

25 A. That is correct, yes, sir.

Case 5:99-cv-00144-RLV   Document 8   Filed 02/04/00   Page 43 of 58

1  Q.  How long have you been retired from Appalachian State
2  University?
3  A.  I think it's five years.
4  Q.  Did you receive a call from me in June of this year?
5  A.  Yes, sir.
6  Q.  And what did I ask you to do -- or if you would do
7  something for me?
8  A.  Yes, sir.  I was asked to see Kenneth Coffey for an
9  intellectual evaluation.
10  Q.  And did you make some arrangements for making this
11  evaluation?
12  A.  Yes, sir.
13  Q.  And did you evaluate -- Did you give him some kind of
14  evaluation?
15  A.  Yes, I gave him an intelligence test.
16  Q.  And where did you give him this intelligence test?
17  A.  In the local prison.
18  Q.  Did you bring your notes?
19  A.  Yes, sir.
20  Q.  Could you tell the Court what you determined from your
21  evaluation and examination from Mr. Coffey?
22  A.  Yes.  This is an individual intelligence test called a
23  Wechsler Adult Intelligence Scale, and it's the revised
24  edition.  And the results are a verbal I.Q. of 62, a
25  performance I.Q. of 61, and a full scale I.Q. of 60.

Case 5:99-cv-00144-RLV   Document 8   Filed 02/04/00   Page 44 of 58

1    Q.  In your evaluation of him did you -- Did he tell you

2    about his past?  Did you ask him about his past?

3    A.  Yes, sir.

4    Q.  Did he tell you about his drinking problem?

5    A.  He told me that he had been drinking for five or six

6    hours prior to the murder, but he didn't go into the past

7    or anything prior to that.

8    Q.  Did he tell you about admissions to Broughton?

9    A.  I'm sorry?

10   Q.  Did he tell you about his admissions to Broughton?

11   A.  Yes, sir.

12   Q.  Did he tell you about his admissions to Cannon?

13   A.  That is correct.

14   Q.  Did he tell you he had problems with emphysema and

15   with bronchitis?

16   A.  That is correct.

17   Q.  Did he tell you that he had busted up his head?

18   A.  I'm sorry?

19   Q.  That he had busted up his head?

20          MR. WILSON:  OBJECTION to relevance.

21   A.  Yes.

22          THE COURT:  Wait just a minute.  (To Mr. West)-

23   When?

24          MR. WEST:  At the time in the past that he had

25   busted up his head.

Case 5:99-cv-00144-RLV   Document 8   Filed 02/04/00   Page 45 of 58

THE COURT: SUSTAINED.

Q. Did he state to you that he could not read and that he could not understand tasks that were presented to him?

MR. WILSON: OBJECT to relevancy.

MR. WEST: I think it's relevant, Your Honor, because of tasks of trying to tell the truth and relate what has transpired in the past -- I think that is relevant (sic).

THE COURT: SUSTAINED.

Q. Did you test his reading level?

A. Yes, I did.

Q. And his writing level?

A. Not his writing, no.

Q. Well his reading level, what was his reading level?

A. His reading level was tested with the Botel Reading Comprehension Test, and it was between first and second grade, but not as high as the second grade.

THE COURT: Do you have another question?

MR. WEST: Yes, Your Honor.

THE COURT: Ask it.

Q. Do you have with you the report that you gave to me?

A. Yes, and I gave one to Mr. Coffey.

Q. Would you read to the Court the summary of your conclusions concerning Kenneth Coffey?

MR. WILSON: OBJECTION.

Page 610

1     THE COURT: (To the witness)- Let me see them,

2 please, sir. Members of the jury, we are going to take a

3 mid-afternoon break before we get underway with anything

4 further. Sheriff, if you will show the jury out, please?

5     WHEREUPON, the following proceedings were had in

6 the absence of the jury:

7     THE COURT: Come back up here, Mr. West. I'm

8 not through with you yet. Mr. West, come back up here.

9 I'm not through with you yet. Stay at council table.

10 Court's not at ease yet. Now I want to know how these

11 things are relevant, sir?

12     MR. WEST: Because I think it will convince or

13 help the jury understand the state of mind of the

14 defendant.

15     THE COURT: At and in respect of what?

16     MR. WEST: To his mental condition and to his

17 mental capacity.

18     THE COURT: At and in respect of what time?

19     MR. WEST: At the time of the murder -- when Coy

20 was hurt and ---

21     THE COURT: (Interrupting)- Are you relying on

22 an insanity defense?

23     MR. WEST: Not on insanity but his inability to

24 remember and to figure out things, his lapses of memory.

25 He cannot understand things. When he is questioned he

Page 611

does not always understand questions that are put to him. He has a tendency to fill in gaps that he does not understand.

THE COURT: I don't see any of that in here.

MR. WEST: It says, "Intellectually he shows no significant strengths and he weak in all areas of tested intelligence. His overall function is less than two-thirds normal or three fifths of normal."

THE COURT: I can read. I can read our mother's tongue. I just read it and I don't see anything of what you just contended is relevant to this case under these summary and conclusions. Where does it say that he is apt to fill in and embellish or take away from? Where does it say that?

MR. WEST: I was going to ask him if people with that intelligence have a tendency to do that.

THE COURT: Well, "people," we are not talking about -- What do you mean, "people"? We are only talking about one person here, your client.

MR. WEST: Well I would ask him if in his professional opinion the defendant would have a tendency to not understand or to evaluate.

THE COURT: What does the state say?

MR. WILSON: Since we started at 2:00 I have withheld objections thinking this thing would dove-tail

into something, but we have heard nothing other than reasons why the jury should feel sorry for this defendant. He has had a rough life. His father has had a rough life. I feel sorry for him and I'm sorry for his mother, but that has nothing to do with the issue before the jury as to whether or not he murdered Coy Hartley. I have not seen the report. I don't know what's in it. That's what I OBJECT about. I have not been furnished a copy of it. I believe Doctor Knight has handed me -- This is one page ---

THE COURT: (Interrupting)- We are talking about the summary and the conclusions.

MR. WILSON: Oh, okay. Your Honor, the state would contend it has no relevance. Whether or not he has had a cut on his leg or been hospitalized for depression or his mother was hospitalized for depression -- all of these things, Your Honor, I am sorry they occurred. But should he prove all these things to the satisfaction of the jury they would not shed any light on whether this man murdered Coy Hartley.

MR. WEST: Well, Your Honor, I think if the state is permitted to put in a trailer ball that they are trying to imply was used as a weapon -- and there was no testimony that it was ever the weapon that was used ---

THE COURT: (Interrupting)- Wait just a minute,

Case 5:99-cv-00144-RLV   Document 8   Filed 02/04/00   Page 49 of 58

Mr. West. What do you mean that the state was permitted
to do that?

        MR. WEST: They introduced into evidence a ball.

        THE COURT: Without objection.

        MR. WEST: That's right.

        THE COURT: You permitted them. I didn't. We
will be at ease for about ten minutes.

        WHEREUPON, following a short recess, the
following proceedings were had in the absence of the jury:

        THE COURT: Bring the jury in, please.

        WHEREUPON, the following proceedings were had in
the presence of the jury:

        THE COURT: Now the last objection as to the
doctor reading his summary and conclusions is SUSTAINED
unless you can tie such a thing in to some area that is
relevant to this trial, Mr. West. I haven't heard it
yet. Maybe you have got it.

        MR. WEST: I want to ---

        THE COURT: (Interrupting)- Ask a question, Mr.
West. I don't need to know what your intentions are. Ask
a question. I don't need to know what your intentions are
(sic).

        MR. WEST: Ask a question of you or of the
witness?

        THE COURT: I'm not testifying.

Q. Doctor Knight, what are sub-tests that you give?

A. The sub-tests of the Wechsler Intelligence Test?

Q. Yes, sir, that's the intelligence test?

A. Yes.

Q. Now do you give sub-tests that measure perceptions, do you not?

A. Yes. There are eleven sub-tests, six are verbally related and five of them are related to what is called performance or problem solving types of things.

Q. Which sub-test did he score the highest?

A. He scored the highest on spatial perception, vocabulary and arithmetic.

Q. Now his spatial perception would enable him to cut wood, would it not?

A. Yes.

Q. Or make it easier for him to do it without injuring himself?

A. Without injuring himself -- or cutting to the right size.

Q. Now you had some tests on which he scored low, did you not?

A. That is correct.

Q. And the lowest was what? Do you have that in your report there?

A. The lowest sub-test was a measure of so-called

1  information which is academically related things or things

2  that one picks up from the environment.

3  Q.  He was lowest also on tasks requiring observation, was

4  he not?

5  A.  That is correct.

6  Q.  And learning?

7  A.  That is correct.

8  Q.  Now by learning that means remembering, does it not?

9  A.  That is correct.

10  Q.  Thank you.  I have no further questions.

11         MR. WILSON:  Thank you, doctor.

12  JIM THORNTON, being first duly sworn, testified under the

13  Direct-Examination by Mr. West:

14  Q.  State your name, please?

15  A.  My name is Jim Thornton.

16  Q.  And what do you do, Mr. Thornton?

17  A.  I work for New River Mental Health, Director of the

18  Substance Abuse Unit.

19  Q.  So you deal with people who have substance abuse

20  problems, do you not?

21  A.  Yes, I do.

22  Q.  When people are found guilty of driving under the

23  influence, oftentimes they have to go to what we call

24  C.A.R.E.S.  Would you tell the jury what C.A.R.E.S. means?

25         MR. WILSON:  OBJECT to C.A.R.E.S. and driving

Page 616

STATE OF NORTH CAROLINA      IN THE GENERAL COURT OF JUSTICE

COUNTY OF WATAUGA               SUPERIOR COURT DIVISION

FILE NO. 94 CRS 4929

|  |  |  |
|---|---|---|
| STATE OF NORTH CAROLINA | ) | |
| | ) | |
| v. | ) | **MOTION CONCERNING** |
| | ) | **SEALED RECORDS AND** |
| ROBERT CHARLES BRAGG, | ) | **PRESERVED RECORDS** |
| Defendant. | ) | |

Defendant, by and through his undersigned appellate counsel, on the grounds set forth in his Motion for Waiver of Privileges heretofore filed herein, and in accordance with this Court's prior orders ordering certain records sealed and other certain records preserved, moves the Court for further orders concerning said records, and in further support of said motion shows unto the Court the following:

1.    Attorney Robert West and Attorney Diane Griffin have client files for their representations of Kenneth Coffey, upon a charge of first degree murder, and in a claim for social security disability, respectively, and William Knight, Ph.D., psychologist, had a file maintained concerning Kenneth Coffey's professional psychological evaluation conducted by Dr. Knight.

2.    Defendant previously sought access to the mental health, physical health, medical treatment, psychological, and other records of Kenneth Coffey maintained by the aforesaid professionals by a Motion for Waiver of Privileges and subpoenas duces tecum, all issued and filed during the trial of Defendant's case in chief herein.

3.    This Court has previously ordered that the documents contained in the files of Attorneys West and Griffin be preserved by them for further proceedings, including possible appellate review, and ordered that certain records of Dr. William Knight be released to Defendant, and other records of Dr. Knight sealed for the record and maintained by the Clerk of the Watauga County Superior Court.

4.    Defendant is informed and believes, and therefore alleges, that the records sealed with the Clerk and ordered to be maintained by Attorneys West and Griffin include mental health, medical, and other records and documentation bearing upon Kenneth Coffey's capacity to testify and the truthfulness and reliability of his statements and testimony which were relied upon by the State and received into evidence in Defendant's trial in chief.

—

5.    Kenneth Coffey was also tried for the murder of the
same victim for which Defendant was tried, and Kenneth Coffey
testified in the trial of Defendant herein, and in said
proceedings, Kenneth Coffey testified and introduced evidence
concerning his (Coffey's past substance abuse, his mental health
treatments, his psychiatric commitments, and a closed head injury
and other injuries, thus waiving any privilege he has or had
concerning such matters, including any privilege to keep
confidential those documents sought by this motion and maintained
by the Watauga County Clerk of Superior Court, Attorney West, or
Attorney Griffin.

6.    Kenneth Coffey has been convicted of the murder of
Marvin Hartley, the same decedent whom Defendant Bragg has been
convicted of murdering.

7.    Called as a witness for the State in the prosecution of
Defendant herein, Kenneth Coffey testified that Defendant
perpetrated the killing of which he now stands convicted, and
without Coffey's aforesaid testimony, the State would have had no
evidence sufficient to allow the jury in Defendant's case to
consider any conviction of Defendant of the murder for which he
was on trial.

8.    Defendant's rights under the State and Federal
Constitutions to Due Process of law and to Confront his accusers
outweigh any interest that Kenneth Coffey may have in maintaining
the confidentiality of or privilege he may retain relating to the
information sought by this motion, and in the interests of
justice any privilege asserted (to the extent it has not been
waived), should be overcome, and the information ordered
released.

WHEREFORE, Defendant prays of the Court as follows:

1.    That the Court review the records and documents
maintained by Attorney West, Attorney Griffin, and the Clerk of
Superior Court (which were received from William Knight) in
camera, in light of any privilege asserted by Kenneth Coffey and
in light of Defendant's rights to Due Process, to Confront his
Accusers, and Defendant's right to Effective Assistance of
Counsel and appellate review and to assure that the entire
documents which were subpoenaed during the trial of this matter
have been duly preserved, as heretofore ordered;

2.    To order that all of the documents deposited with the
Watauga County Clerk of Superior Court and all records maintained
by Attorneys West and Griffin that relate to Kenneth Coffey's
substance abuse, mental health treatments, psychiatric
commitments, closed head and other injuries, and any other
circumstances or conditions that may relate to Coffey's
credibility or reliability, or that may be exculpatory to

2

STATE OF NORTH CAROLINA     IN THE GENERAL COURT OF JUSTICE

COUNTY OF WATAUGA     FILED   SUPERIOR COURT DIVISION

1996 FEB 14   6 22 FILE NO. 94 CRS 4929

WATAUGA COUNTY C.S.C.

BY_____

STATE OF NORTH CAROLINA )
                )
    v.                )       MOTION FOR WAIVER
                )         OF PRIVILEGES
ROBERT CHARLES BRAGG,    )
      Defendant.       )

Pursuant to G.S. 8-53.8, G.S. 8-53.3, G.S. 8-53.1 and pursuant to the North Carolina Rules of Professional Conduct for Attorneys, Defendant moves that the Court enter an Order waiving any and all privileges that Kenneth Coffey may have in the nature of attorney-client privilege, physician-patient privilege, psychologist-client or patient privilege; and counseler-client privilege as may exist between Kenneth Coffey and New River Mental Health, Broughton Hospital, any other health care or mental health providers pertaining to Kenneth Coffey, Attorney Robert West, Attorney Diane Griffin, and Ph.D. Psychologist William Knight. In support of this Motion, Defendant shows unto the Court the following:

1. Kenneth Coffey has been announced in this cause, which is a capital murder proceeding, to be a witness upon which the State intends to rely.

2. Kenneth Coffey has heretofore been tried and convicted of the first degree murder of Coy Hartley, the same victim whom Defendant is charged with killing.

3. According to information provided to Defendant in discovery, and the record proper of the trial and sentencing proceedings for Kenneth Coffey, Kenneth Coffey has given as many as six different statements to law enforcement, all of which are substantially inconsistent, and all of which either involve or implicate Defendant, in various (and inconsistent) ways.

4. In his own trial, Kenneth Coffey obtained, by subpoena issued from the Bench, his own records from Broughton Hospital, which were then turned over to his court-appointed psychologist, William H. Knight. Thereafter, William H. Knight testified concerning his examination of Kenneth Coffey, his findings and opinions pertaining to Kenneth Coffey's mental health, and the results of testing conducted by William H. Knight on Kenneth Coffey, all during the trial of Coffey's case in chief, presented during the defense case, Dr. Knight being called as a witness by Defendant.

5. In proceedings during Kenneth Coffey's trial, Coffey sought to suppress his various statements on several grounds, including the grounds that Coffey was not capable of understanding the questions he was asked in interrogation, or clearly expressing himself in response thereto, based upon reasons pertaining to his mental health, and an alleged open head injury Coffey had previously sustained, all of which matters are of record in the proceedings in State v. Kenneth Coffey.

6. Defendant Coffey has already waived his privilege as pertains to his mental health records and other matters pertaining to his mental health and medical treatment, by raising and airing issues relating thereto during his own trial, motions relating to his trial, and sentencing proceedings.

7. Attorney Diane Griffin, according to the record in the Coffey proceedings, had been representing Coffey in his efforts to obtain social security disability, and Defendant Bragg is informed and believes that Diane Griffin has in her possession certain medical and mental health records that will be relevant if Coffey becomes a witness herein, or if statements attributed to Coffey are introduced into evidence or argued to the jury herein.

8. Attorney Robert West, according to the record proper in the Coffey proceedings, obtained mental health records from Broughton Hospital pertaining to Defendant Coffey, in connection with his defense, and in fact used them in connection with Coffey's defense, and at one time turned the records over to the court-appointed psychologist, William H. Knight, prior to Knight's testimony on behalf of Coffey. Defendant Bragg does not know whether Attorney West or Psychologist Knight have the records which were obtained, but the record in the Coffey proceedings makes clear that they were in fact obtained and utilized in Coffey's defense as presented in evidence in the Coffey proceedings.

9. The records and information sought by Defendant herein are necessary and relevant, first as regards Kenneth Coffey's capacity to testify, and second, as regards Coffey's credibility, bias, interest, apparent understanding as a witness, ability to recall, and other matters critical to Defendant Bragg's position in these proceedings.

10. Without the records and information sought, and the waiver of the privileges requested herein, Defendant will be unable to have Equal Protection of the Laws, Due Process of the Law, Effective Assistance of his Court-Appointed Attorneys, and the Opportunity to Present a Defense and Confront the Witnesses Against Him, all as afforded by the United States and North Carolina Constitutions. Disclosure of the information sought

2

Defendant's experts, and follow-up on the information sought and received, prior to Defendant being required to cross-examine Kenneth Coffey.

This the ___14th___ day of February, 1996.

Jeffery M. Hedrick
Attorney for Defendant
P.O. Box 465
Boone, NC 28607
(704) 265-4050

4

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the document to which this certificate is affixed was served upon the other party to this action by hand delivering a copy of the same to an employee in the offices of the District Attorney for the 24th Judicial District at his office in the Watauga County Courthouse in Boone, NC 28607

This the _14th_ day of February, 1996.

Jeffery M. Hedrick
Attorney for Defendant
P.O. Box 465
Boone, NC 28607
(704) 265-4050

6